FILED

2017 Aug-22  AM 11:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CAROL H.  STEWART | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER: _____** |
| | ) | |
| **HARTFORD LIFE AND ACCIDENT** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Carol H. Stewart, and hereby files her Complaint against The Hartford.

## PARTIES

1.      The Plaintiff, Carol H. Stewart ("Stewart"), is a citizen of the State of Alabama over eighteen years of age. Ms. Stewart resides in Jefferson County, Alabama.

2.      Defendant, The Hartford ("Hartford") is the Administrator of Long-Term Disability Policy No. GLT024554 ("the Plan") for Employees of Burr & Forman LLP that has improperly denied owed benefits to Ms. Stewart.  Upon information and belief, Hartford is a Connecticut corporation doing business in the State of Alabama.

1

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights and statutory violations of ERISA under 29 U.S.C. §1132.  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a), (e)(1), and (f) and 28 U.S.C. §1131.  Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Ms. Stewart, as an employee insured for disability, was supposed to be treated as a beneficiary by Defendant as statutory fiduciary.  Instead, Defendant has victimized Ms. Stewart by engaging in utterly reprehensible claim handling procedures.

## STATEMENT OF FACTS

5.     Ms. Stewart is an insured under the Long Term Disability ("LTD") Policy No. GLT024554 ("The Plan"), sponsored by her employer, Burr & Forman LLP ("Burr"). The Hartford is the administrator of the policy. The Plan provides insureds, like Ms. Stewart, long-term disability benefits.

2

6.     Ms. Stewart, born January 18, 1953, worked as an associate attorney at Burr from 1983 until becoming an equity partner in 1990. She worked as an equity partner until her disabilities forced her to stop on March 12, 2013. As an associate attorney from August 1, 1983 to December 31, 1989 and as an equity partner from January 1, 1990 to March 31, 2012, Plaintiff practiced law and represented clients primarily in the areas of real estate and condominium law and business torts litigation.

**A.     Burr & Forman's Plan has Never Been Terminated but the Benefits Paid Under the Plan have Been Funded by Different Policies of Insurance.**

7.     Burr & Forman equity partners participate in a welfare benefit plan that includes long term disability benefits, life insurance benefits, and basic accidental death and dismemberment benefits, among other benefits as the Plan has been amended from time to time.  Burr & Forman provides the Plan and equity partners pay 100% of the disability insurance costs attributable to participation in the Plan; no portion of the long term disability insurance premiums for equity partners is paid by Burr & Forman.

8.     In August 2007, Sun Life Assurance Company of Canada ("Sun Life") underwrote the Plan, which included a long term disability insurance policy ("Sun Life Policy").  The Plan and the Sun Life Policy specifically stated: "The cost of your Long Term Disability Insurance is paid for entirely by you.  This is your

contributory insurance." The Sun Life Policy specifically provided that the long term disability insurance will continue during any period the premium is waived under the Sun Life Policy.  Thus, Plaintiff's Sun Life long term disability insurance continues to this date. (*See* Exhibit "A" Sun Life Policy ).

9.      In 2010 Burr & Forman decided to change the insurance company that administered the Plan from Sun Life to Defendant The Hartford.  Hartford issued to Burr & Forman, the "Policyholder," the two insurance policies at issue in this case, namely, Hartford Policy Number GLT-869923 (the "Disability Policy"); and Hartford Insurance Policy Number: GL-86992, a life insurance policy in the amount of $500,000, among other benefits (the "Life Insurance Policy")[1] (collectively the "Policies").  The "Effective Date" on the face of the Hartford Policies was October 1, 2010. (*See* Exhibit "B" The Hartford Policies).

10.     As an equity partner, Plaintiff paid the premiums for the Disability policy from October 1, 2010 to March 31, 2012. As a Retired Partner, Plaintiff continued to pay the premiums for the Disability Policy from April 1, 2012 to December 31, 2013. Plaintiff's insurance under the Sun Life Policy continued after the effective date of the Disability Policy, so Plaintiff was covered under the Sun

---

[1] Although referenced as the "Life Insurance Policy," the Hartford Life Insurance Policy included other benefits, including accidental death and dismemberment insurance benefits. The $500,000 Life Insurance Policy continued until an insured's 70th birthday.

4

Life Policy on the day before the Effective date of the Disability Policy. Insurance coverage for the Plaintiff under the Sun Life Policy has never been terminated.

11.     While there was a provision in the Disability Policy that addressed equity partners who were not Actively at Work on the Effective Date of the Disability Policy due to an illness or sickness, there was no provision in the Disability Policy that excluded from coverage "Full Time Active Employees" who were equity partners with "Pre-existing Conditions", unless their coverage for pre-existing conditions had been limited by a pre-existing condition limitation under the Prior Policy. The Sun Life Policy that Plaintiff was initially eligible for coverage under is not a prior policy as defined by The Hartford, but rather the very same plan. (Exhibit "B" p. 11 LTD Policy).

12.     It is the Plaintiff's position that there is only one Burr & Forman Long-term disability Plan and that it has never been terminated since Plaintiff was eligible as an insured. Rather, at different times throughout Plaintiff's employment with Burr & Forman, different insurance companies have issued policies of insurance that covered eligible employees the Plan as a means of funding potential benefits under the Plan.

**B.**     **<u>The Hartford's Denial of Plaintiff's LTD Benefits on the Basis of Receiving Benefits Under a Prior Plan is Erroneous and an Unreasonable Interpretation of the Plan.</u>**

13.    Plaintiff has a long standing diagnosis of Parkinson's disease, which she was first informed of in August 2007. Parkinson's disease is a chronic, progressive, debilitating, degenerative neurological disorder with many and varied symptoms.   The medical literature on Parkinson's is replete with research and detailed descriptions of the symptoms of the Disease, which include   resting tremor, bradykinesia or slow movement, rigidity and postural instability, freezing, micrographia, unwanted accelerations, dystonia, and stooped posture, and other nonmotor symptoms, such as cognitive disorders, including memory difficulties, slowed thinking and confusion, sleep disorders, mood disorders, low blood pressure, vision problems, anxiety, depression, fatigue and loss of energy, medication side effects, and impulsive and compulsive behavior; among other symptoms.  (*See* Exhibit "C" Medical Records w/ Initial Diagnosis and Medical Literature).

14.    As of this date, there is no cure for Parkinson's Disease and the disease invariably progresses. Because of the decline in Plaintiff's condition and the resultant reduction in her share of equity partnership income, in December 2008 Plaintiff filed a partial disability claim under the Sun Life Policy.  Sun Life found the Plaintiff to be "Partially Disabled,"[2] as defined under the Sun Life

---

[2] Under the Sun Life Policy, "Partial Disability or Partially Disabled means, you, because of your Injury or Sickness, are unable to perform the Material and Substantial Duties of your

Policy, and entitled to "Partial Disability Benefits," effective June 30, 2009. (*See* Exhibit "D" Approval letter dated).

15.    Although she qualified for Partial Disability Benefits under the Sun Life Policy based upon her diminished earnings caused by Parkinson's Disease symptoms from June 30, 2009 to March 31, 2012, Plaintiff remained an equity partner at Burr & Forman (albeit with a reduced partnership interest each year). As her earnings from Burr & Forman decreased, the Partial Disability Benefit paid under the Sun Life Policy was adjusted on an annual basis.

16.    On April 1, 2012, Plaintiff became "Totally Disabled" as defined under the Sun Life Policy.  From April 1, 2012 to the date of filing this Complaint, Sun Life has paid the Maximum Monthly Benefit under the Sun Life Policy, which amount does not fully compensate Plaintiff to the level of 60% of her 2008 pre-disability earnings.   The waiver of long term disability insurance premiums continued after Sun Life determined the Plaintiff was Totally Disabled.

17.    Given the fact that Plaintiff was entitled to Partial Disability Benefits as of June 30, 2009 and given the fact that she is now Totally Disabled, the Sun Life Policy continues in effect to the date of filing this Complaint and continues to

---

Own Occupation and you have Disability Earnings of less than 80% of your Indexed Total Monthly Earnings."

be in effect until the Plaintiff's 65th birthday,[3] unless Plaintiff fails to meet the definition of "Totally Disabled" under the Sun Life Policy.  (Exhibit "A" p. 5).

18.     On or about July 18, 2012, Plaintiff submitted to Hartford her timely, properly documented claim and proof of loss for long term disability benefits under the Disability Policy.   She also submitted the Attending Physician's Statement of Disability.  In the Physician's Statement dated April 17, 2012, Dr. David G. Standaert, the Plaintiff's treating or attending physician stated that she was diagnosed with Parkinson's disease in 2007 and that her symptoms of slowness, tremor, fatigue, rigidity and bradykinesis had retrogressed since that time.   Dr. Standaert also stated that Plaintiff has cognitive impairment and described the cognitive impairment as "impaired mental concentration due to Parkinson's Disease."  (*See* Exhibit "E" Attending Physician Statement dated April 17, 2012).

19.     Dr. Standaert also completed the portion of the Attending Physician's Statement of functional capacity.  He opined that Plaintiff could sit two hours, stand for thirty minutes and walk for thirty minutes.   Additionally, he stated Plaintiff could lift one to ten pounds occasionally and could drive occasionally but that based upon his clinical assessment as of March 31, 2012, the Plaintiff could

---

[3] The Sun Life Policy specifically provided that the long term disability insurance will continue during any period the premium is waived under the Sun Life Policy.  Thus, Plaintiff's Sun Life long term disability insurance continues to this date.

not lift more than ten pounds in a workplace environment, should not engage in activities that require Plaintiff to bend at the waist, kneel or crouch, or reach above her shoulder.  Dr. Standaert reported that the Plaintiff could occasionally reach (nonloadbearing) at waist desk level and below waist/desk level.  He opined that the Plaintiff could never engage in work that required "fingering/handling."  He stated that the expected duration of the current restrictions and limitations were "permanent, irreversible and would worsen with time." (Exhibit "E").

20.    On or about July 26, 2012, Burr & Forman submitted on Plaintiff's behalf its properly documented Application for Long Term Disability Benefits, Employer's Section.  Burr & Forman provided information regarding the physical and mental aspects of Plaintiff's work as required on the Hartford disability claim form.   A detailed job description of Partner/Attorney and of Plaintiff's work was also submitted.  Hartford acknowledged receipt of Plaintiff's claim on July 20, 2012. (*See* Exhibit "F" Form and Job Description).

21.    On August 3, 2012, the Ability Analyst sent an Eligibility Verification Request ("EVR") to Hartford's Regional Account Manager responsible for the Burr & Forman account to confirm whether the Plaintiff was eligible for coverage under the Disability Policy.  She also requested information as to whether the Policies

were contributory or noncontributory.[4] On August 15, 2012, without further explanation, Ms. Balogh noted in the Plaintiff's file, "EVR not needed for atty claim." (*See* Exhibit "G" Adjuster's Notes).

22.     On August 22, 2012, the Ability Analyst wrote to Sun Life seeking information regarding the Sun Life Policy and benefits paid to Plaintiff under the Sun Life Policy, which were disclosed by Plaintiff in her proof of loss. On August 24, 2012, Dr. Standaert returned, via fax, Hartford's faxed request for more information regarding physical limitations of the Plaintiff, advising Hartford that in a workplace environment, Plaintiff could sit a total of two hours per day, stand for a total of one-half hour per day, and walk a total of one hour per day. (*See* Exhibit "H" Restrictions).

23.     On September 5, 2012, the Ability Analyst conducted a telephone interview with the Plaintiff.  During the call Plaintiff confirmed with the Ability Analyst among other things, that the physical and cognitive effects of Parkinson's disease and the stress of the work made it impossible for her to perform the essential duties of her work.  Also, Plaintiff explained that although medications

---

[4] The Regional Account Manager replied on August 6, 2012 that they did not have this information and Ms. Balogh needed to reach out to Plaintiff's employer, despite being advised that by Kevin C. Stockton, Examiner Sacramento, that there was no need for an EVR.

helped at first, as the disease progressed, she could not work in the legal profession given the stress and responsibilities.

24.    On September 12, 2012, Ms. Balogh reported in the computer that she was sending a second request to Sun Life for verification of the disability benefits that Plaintiff was receiving. She noted that Plaintiff may be receiving group disability benefits through the "prior" LTD carrier and if so she may not be eligible to receive these benefits under The Hartford Plan. Ms. Balogh clearly did not accept the fact that Plaintiff's plan was paid for by Burr & Forman, and therefore when The Hartford began underwriting the group LTD policy, which had been through Sun Life that Plan was still in effect, the funding mechanism was the only thing that changed which had no effect on Plaintiff's eligibility. [5] (*See* Exhibit "I" Adjuster Notes).

25.    Robert Goodall, Sun Life's representative, sent confirmation in writing that Sun Life was paying Plaintiff long term disability benefits under the Sun Life Policy.  Within minutes of receiving the electronic document from Mr. Goodall, Ms. Balogh entered her denial recommendation in the Hartford computer on the basis that she was ineligible to receive benefits since she had received Long-

---

[5] It was later revealed through a document production that Ms. Balogh had in her file and referred to the Burr & Forman nonequity partner long term disability policy during the call with Robert Goodall.

11

term disability benefits from Sun Life since 2007 for Parkinson's disease. (*See* Exhibit "J" Adjuster Notes).

26.    Plaintiff received notice of the initial denial letter on September 24, 2012. Hartford reasoned that she became insured under their policy October 1, 2010, when Hartford became the Plan administrator for Burr & Forman. Not only had she been insured but she paid the premiums for fifteen months prior to her date last worked March 31, 2012. Hartford's denial stated:

> Our review of your file indicates that your last day of work was 03/31/2012.  However, you began receiving partial disability benefits effective 06/30/2009 through Sun Life Financial.  We confirmed that the disability coverage with Sun Life Financial (Policy #94198) is group coverage through Burr & Forman LLP.

(*See* Exhibit "K" Denial Letter from The Hartford dated September 24, 2012).

27.    Hartford's denial is based on the following policy language:

> "IF you are receiving or are eligible for a Disability under a prior disability plan that was sponsored by your employer was terminated before the effective date of the policy no benefits will be payable for the Disability under the policy."

(Exhibit "K").

28.    The interpretation of the plan by Hartford is incorrect and unreasonable for two reasons: Plaintiff was never being paid under a prior plan and her Disability for which she submitted her claim in April 2012 was a new claim for

completely different benefits than those she had been receiving since 2009 under the Sun Life plan.

29.    Plaintiff was receiving partial disability benefits from Sun Life due to a 20% reduction in her income while she continued to work at Burr & Forman as an equity partner. Although Hartford claims that this policy was terminated in 2010 when they began to administer the plan, it was clearly the very same plan that Plaintiff had received her partial disability benefits under. The Plaintiff had her premiums waived due to qualifying for that benefit, and remaining eligible for Long-term disability benefits under the plan.

30.    The Hartford provision that should be read to the exclusion of all others is the term "plan". The Hartford did not state an insured would be ineligible for pre-existing if they had received benefits under a prior "policy" but a prior "plan". Plaintiff never had a prior plan, when The Hartford took over as plan administer in 2010, the funding mechanism for the plan changed but she was always eligible due to satisfying her elimination period and paying The Hartford premiums for over a year. (Exhibit "B" p. 11 LTD Policy).

31.    The plan defines Prior Policy as "the long-term disability insurance carried by the Employer on the day before the Policy effective date". While Sun Life was carried by Burr and Forman prior to the Hartford's effective date as the new administer that replaced Sun Life, Plaintiff's claim does not fall under this

13

definition. Rather, the pre-existing provision does not use "Prior Policy" but specifies ineligibility for those who received benefits under a "prior disability plan". (p.11 of LTD Policy). Hartford included the pre-existing language for its benefit and it does not provide a valid basis to deny Plaintiff's claim despite the fact The Hartford had every opportunity to protect itself when this provision was drafted. This is a reasonable interpretation of the policy, which must be construed in Plaintiff's favor. To contend that the use of "prior policy" and "plan" is synonymous in Plaintiff's case would be an entirely ambiguous interpretation.

32.    Plaintiff also should have been approved for benefits because she submitted a new claim when she applied or her Long-term disability July 18, 2012, which the pre-existing provision does not affect whatsoever. The plan defines "Disability" as a specific point in time: 90 days after the last day an insured worked that caused a drop of 20% of income. Disability is not defined as a medical condition under the plan. Plaintiff satisfied the definition of Disability June 29, 2012, because she remained disabled after March 31, 2012 and sustained the 20% reduction in income. (Exhibit "B" p. 20 of LTD Policy).

C.    **The Hartford's Employees Engaged in Improper Claims Procedures in Reviewing Plaintiff's Appeals and Rendering it's Denials for Waiver of Premium Benefits.**

33.    On July 2, 2012, the Plaintiff submitted to Hartford her application for waiver of premium under the Life Insurance Policy on the proper claim forms and

provided a proof of loss for Waiver of Premium ("Application"). Hartford never acknowledged receipt of the Application and never advised Plaintiff that the Physician's Statement in the Waiver of Premium file had not been received.

34.    Burr & Forman filed its portion of the Application for Waiver of Premium on July 26, 2012.    It was not until July 31, 2012, that Hartford acknowledged receipt of Plaintiff's Application, presumably after the Burr & Forman portion of the Application was received.  Hartford has never claimed that the Plaintiff's Application or the Attending Physician's portion of the Application were missing.  (*See* Exhibit "L" WOP PTD Disability Extension Claim Form).

35.    Plaintiff listed the various symptoms of Parkinson's disease that she had continued to suffer from in her application. Among these symptoms are cognitive deficits in the face of stress, and the ability to react to stressful situations. Not only is Parkinson's an incurable disease that attacks the motor system but symptoms of tremors, stiffness of the limbs and trunk, slowness of movement, postural instability, and difficulty walking only worsen over time as the disease progresses. (Exhibit "L").

36.    The Waiver of Premium claim was assigned to Ability Analyst, Vanessa Balogh, the same Ability Analyst assigned to Plaintiff's long term disability claim. Ms. Balogh's initial claims note stated Plaintiff's APS from Dr. Standaert had been received in her LTD file, but Hartford would need his medical

records to conclude if she was capable of working in any occupation. There was no entry in the Waiver of Premium file from August 1, 2012 until September 24, 2012, when the Ability Analyst entered her "Denial Recommendation" on the Waiver of Premium claim. This was the same date that Plaintiff's LTD benefits were denied, which suggests that Hartford's denial was completely erroneous. (*See* Exhibit "M" Adjuster's notes).

37.    It is evident that the Waiver of Premium file was created by virtue of the LTD file's paperwork since there was never an acknowledgement of receipt of application and there is mention of the Waiver of Premium claim in the LTD file, although nothing was done in the Waiver of Premium file until Hartford's initial denial. Additionally, the Waiver of Premium file never contained the APS form from Dr. Standaert, it too was also pulled from the LTD file. This claims handling is clearly unethical and a breach of fiduciary duty to Plaintiff since it is evident The Hartford did not even attempt to consider the Waiver of Premium claim under its policy definition but rather issued a blanket denial as soon as the LTD claim was vetted and denied.

38.    The Hartford's initial denial's consideration of the APS in the LTD file is contrary to the definition of disabled under the Waiver of Premium claim. The definition of disability for Waiver of Premium of Life Insurance benefits states:

**Disabled**: *What does Disabled mean?*

Disabled means You are prevented by injury or sickness from doing any work for which You are qualified by:

1)    education;
2)    training; or
3)    experience.

In addition, You will be considered Disabled if You have been diagnosed with a life expectancy of 12 months or less.

(Exhibit "B" p. 11 Life Policy).

39.    Not only did The Hartford fail to properly handle and follow up on the Waiver of Premium claim, but it gave invalid reasons for its initial denial. Despite accepting the undisputed and unquestioned information contained in the Plaintiff's Application, including the Employer's Section, the Attending Physician's Statement in the long term disability claim file, and the Attending Physician's response to Hartford's clarification letter regarding the total number of hours the Plaintiff could stand, sit and walk per day, the Ability Analyst determined that the Plaintiff was "not found to be TD from any work." The Hartford had a fiduciary duty to process the Waiver of Premium claim in accordance with its own policy.  (*See* Exhibit "N" Denial of WOP Claim dated October 1, 2012).

40.    Ms. Balogh also recognized and accepted without question the physical and cognitive restrictions and limitations as assessed by Dr. Standaert and as reported by the Plaintiff, noting specifically that Plaintiff "can never finger/handle" and that she "has impaired mental concentration" due to Parkinson's

Disease.  Ms. Balogh then curiously stated simply, without any analysis of work for which Plaintiff was qualified by education, training or experience given her restrictions and limitations and without any basis or documented support of availability of such work in Plaintiff's geographical area, "Given physical limitations, EE is not found to be TD from any work." (Exhibit "N").

41.    Despite being aware of cognitive impairment issues due to Parkinson's disease, no neuropsychological testing was ordered or requested by the Ability Analyst or her supervisor, Monique Marr.  Moreover, analysis of Plaintiff's Residual Functional Capacity was undertaken, no Employee Analysis Report ("EAR"), or any other employability assessment or analysis was ordered or undertaken by Hartford, and there was no suggestion of a single job for which Plaintiff was qualified given her limitations and restrictions.

42.    Obviously Plaintiff would not have met the Department of Labor sedentary strength category, but Ms. Balogh offered no explanation or reason for her conclusion that Plaintiff could work. Monique Marr, merely approved with Balogh's denial stating: "Agree with denial. We have not verified premiums were paid through EP so please add reservation of rights for PW language". (*See* Exhibit "O" Adjuster Notes).

43.    Plaintiff received her actual denial letter October 1, 2012. The Hartford's denial letter failed to mention Dr. Standaert's observations in his APS

of Plaintiff's symptoms of fatigue, slowness, and bradykinesis. Dr. Standaert limited reaching to only non-load bearing and never above the shoulder.  Ms. Balogh failed to include the following undisputed limitations and restrictions assessed by Dr. Standaert of never bending at the waist, kneeling, crouching, fingering, handling, and cognitive impairments as a result of Parkinson's. (*See* Exhibit "P"  Denial Letter for WOP dated October 1, 2012).

44.    Plaintiff's work for which she was qualified by education and by twenty-nine consecutive years of training and experience was as a lawyer engaged in the practice of law with specific specialties in litigation, real estate and condominium law. The denial stated that Plaintiff's restrictions don't support her being disabled from any occupation despite the fact that her own occupation was sedentary. Also, regarding the progress of the disease and the expected duration of the restrictions and limitations, Dr. Standaert reported that Plaintiff's medical condition had retrograded and that the duration of the restrictions and limitations is "Permanent, Incurable Disease, Will worsen with time." (*See* Exhibit "Q" Dr. Standaert Record).

45.    In finding that the Plaintiff's condition did not prevent her from doing "any work," the Analyst did not consider or address Plaintiff's qualifications as set forth on Plaintiff's Application for Waiver of Premium, described no work for

which the Plaintiff was qualified by education, training or experience, and described no work available to the Plaintiff in the work place, given her physical and cognitive restrictions and limitations.  Once more, Hartford did not perform an EAR or request any type of functional assessment of the Plaintiff.  In the entire file, there was no suggestion of any "work" or job available to Plaintiff given her restrictions and limitations.

46.     On October 10, 2012, Plaintiff filed her timely appeal of Hartford's denial of her Application for Waiver of Premium.  In her appeal the Plaintiff raised issues related to the fact that Hartford failed to consider Plaintiff's qualifications, given her physical and cognitive limitations and restrictions, and failed to consider the availability of particular work for which the Plaintiff was qualified by education, training or experience, among other issues.  Also in her appeal, the Plaintiff pointed out that the Ability Analyst had misquoted the Life Insurance Policy by adding the phrase "or could become" qualified";language not contained in the Life Insurance Policy, which imposed a higher standard on Plaintiff to prove she could not work anymore than the terms of the policy. (*See* Exhibit "R" Appeal).

47.     Regarding her cognitive limitations, the Plaintiff specifically advised Hartford in her appeal:

> It is well documented by medical research and is common knowledge
> in the medical community that Parkinson's disease negatively affects

and directly impacts cognitive functions and the ability to react under stress and adverse conditions. Stress exacerbates Parkinson's symptoms and makes normal functions impossible . . . The inability to adequately represent claims because of my limited cognitive functions and my adverse reaction to stress and adverse conditions would not permit me to continue to practice law, the work for which I am qualified by education, training or experience . . .

(Exhibit "R").

48.     The appeals unit from The Hartford wrote Plaintiff a letter on October 18, 2012 stating that there is a separate appeal unit for consideration of claims that have been denied and each appeal specialist is "charged with making an independent assessment of the claim based on the relevant policy provisions and all of the evidence in the claim file". (*See* Exhibit "S" Letter from Appeals Unit).

49.     On October 19, 2012, the appeal was internally assigned to Edna Golych, Appeal Specialist. Hartford's internal records reflect Ms. Golych could act independently and there was no supervisor sign off requirement for her decisions. On November 13, 2012, as part of the appeal process, Ms. Golych prepared a "Medical Consultant – Referral Form" requesting that Hartford retain through the University Disability Consortium ("UDC") an outside medical consultant with a specialty in Neurology. The consultant was asked to contact Plaintiff's Primary Attending Physician regarding the Plaintiff's current abilities, restrictions and limitations and to give an independent opinion of Plaintiff's

functionality, restrictions and limitations. (*See* Exhibit "T" Medical Consultant-Referral Form).

50.    At Ms. Golych's request, Hartford retained through University Disability Consortium ("UDC"), Dr. Uzma Sharif, a Board Certified Neurologist licensed in the states of Rhode Island and California. There is no evidence to suggest that Dr. Sharif had any subspecialty or clinical interests in the diagnosis or treatment of Parkinson's Disease, or had specific knowledge of Parkinson's Disease symptoms, particularly the adverse cognitive aspects of Parkinson's Disease.

51.    In her review, Dr. Sharif described the records she considered and the clinical findings reflected in the medical records.  She specifically reviewed the 4/17/2012 Attending Physician's Statement of Disability, and the 8/20/12 follow-up request by Hartford in the long term disability claim file.  She also specifically referenced medical records in the file.   The Report then lists the "Restrictions/Limitations Per Attending Physician." Dr. Sharif listed all of the restrictions and limitations identified by Dr. Standaert, except the restriction that the Plaintiff could never engage in "fingering/handling."  No reference was made to the Physician's Statement which was to have been submitted with the Waiver of Premium Application, presumably because it was not in the file. (*See* Exhibit "U" Dr. Sharif Report).

22

52.     Dr. Sharif even called Dr. Standaert to gather an updated opinion on Plaintiff's condition on November 27, 2012. Dr. Standaert reported that Plaintiff had progressive deterioration in her motor function and postural instability. Upon completing her review Dr. Sharif provided restrictions for Plaintiff as follows: sitting four to six hours a day, walking and standing a half hour to one hour a day, and carrying no more than ten pounds. There was no explanation or basis for these restrictions by Dr. Sharif to support her prescribed restrictions, despite the fact that Dr. Standaert's restrictions limited plaintiff to sitting no more than two hours per day. (*See* Exhibit "U", Exhibit "V" Dr. Standaert Restrictions).

53.     Dr. Sharif also suggested that Plaintiff avoid driving and she will "likely continue to be more limited in most physical and cognitive activities depending on her rate of overall decline" due to the fact that Parkinson's disease is a "chronic irreversible disease". Ultimately, the peer review gave the opinion that Plaintiff could perform work "where she does not have the stress of deadlines, but has open ended tasks that she can do at her comfort level." Dr. Sharif was never asked to determine physical restrictions or whether Plaintiff could return to work; The Hartford merely asked her to provide cognitive restrictions, which she only stated that Plaintiff could not drive. Although she noted Plaintiff had not undergone neurological testing she did not recommend or suggests such testing be done to determine further cognitive restrictions. (Exhibit "U").

23

54.     Although Dr. Sharif's review was entirely lacking in any medical basis for the limitations provided, and the assertions she made about work Plaintiff could perform and physical restrictions both of which far exceeded her discretion, Plaintiff's initial denial of her Waive of Premium was reversed on December 5, 2012.  In The Hartford's letter, Ms. Golych stated that "based on review of the documentation in your claim file together with additional medical information obtained at the appeal level we have determined that you meet the definition of Disabled and are eligible for WP benefits." (*See* Exhibit "W" Approval Letter).

55.     In making her "Final Decision," the independent Appeal Specialist necessarily found that the Plaintiff was prevented by sickness, Parkinson's Disease, from doing any work for which she was qualified by: a) education; b) training; or c) experience.  In making her determination, the file reflects that the Appeal Specialist considered physical and cognitive restrictions, and considered limitations and functionality of the Plaintiff as they related to the work for which the Plaintiff was qualified by education, training or experience.  The Appeal Specialist did not request neuropsychological testing of the Plaintiff or a physician/psychological examination of Plaintiff before making her "Final Decision," although she was fully aware of the Plaintiff's cognitive impairment. She also did not investigate or consider whether Plaintiff could perform activities of daily living ("ADL's").

56.     Ms. Golych's decision to reverse the denial was entirely based on Dr. Sharif's review, specifically the progression of her disease, slowed cognitive processing, and impaired motor skills. In her Appeal Specialist Review and by her "Final Decision," Ms. Golych considered and treated Dr. Sharif's statement that Plaintiff "can work somewhere where she does not have the stress of deadlines, but has open ended tasks that she can do at her comfort level" as a cognitive restriction and limitation as the question was posed to Dr. Sharif.

57.     Once the final appeal decision was made per The Hartford's policy there was no other action to be taken on the Wavier of Premium claim. The only circumstances described in the Life Insurance Policy that would allow Hartford to terminate the Waiver of Premium after the Final Decision of the Appeal Specialist, are 1) if the Plaintiff returned to work for more than five days, 2) if the medical condition of the Plaintiff improved to the extent that she did not "remain Disabled" under the Life Insurance Policy, or 3) if she failed to submit to required medical examination.   It is undisputed that none of those events occurred. (*See* p. 11-12 of Life Policy Exhibit "B").

58.     The Hartford failed to follow its own policy terms, when after approving the Waiver of Premium claim, Vanessa Balogh ordered an independent medical examination for neuropsychological evaluation on January 3, 2013. Balogh ordered this testing even after acknowledging that Plaintiff's condition was

25

unlikely to improve and that she should be evaluated only on annual basis due to the nature and decline of Parkinson's disease. Balogh ordered this testing based on Dr. Sharif's medical review, although the review should have had no bearing on any claim maintenance after the reversal of denial of December 5, 2012, especially since Dr. Sharif's review was provided for the sole purpose of furnishing cognitive restrictions. Ms. Golych's decision to reverse was supposed to be final.

59.   Contrary to procedure, Balogh contacted a third party, Psy Bar, to schedule an IME of Plaintiff. PsyBar was at the time, "the nation's largest specialty provider of psychological, neuropsychological and psychiatric Independent Medical Evaluations, Fitness for Duty Evaluations & Vocational Assessments with over 1600 doctors across the country." Case histories on the internet disclose a close and symbiotic relationship between Hartford and PsyBar. (*See* Exhibit "X" Psybar Page).

60.   PsyBar recommended and Hartford approved Dr. Nick DeFilippis, a psychologist with a Masters degree and a PhD in Clinical Psychology (not a Physician with a Specialty in Neurology as specified in the Referral Form) as the IME who would conduct the neuropsychological testing of the Plaintiff.  Dr. DeFilippis maintained his office in Atlanta, Georgia, more than sixty minutes from Birmingham, Alabama, but he was an Alabama licensed psychologist.  PsyBar claimed to have no affiliated IME's closer than Atlanta, despite there being many

26

excellent neurologists, neuropsychologists and psychologists who practice in the Birmingham, Alabama area. (*See* Exhibit "Y" CV of DeFilippis).

61.    Dr. Nick DeFilippis's Curriculum Vitae, however, reflected no experience or expertise in Parkinson's disease and its symptoms, or his ability to give expert opinions on the qualifications and functionality to practice law or work in the legal field.   Specifically, of the ninety-seven Publications/Presentations listed in his Vitae, none of the publications or presentations addressed Parkinson's Disease or its symptoms, or the functionality of a lawyer. Balogh initially reached out to Plaintiff and requested her availability for an IME on January 11, 2013.

62.    Testing with Dr. DeFilippis was finally scheduled for March 8, 2013, despite the fact that Ms. Golych's December fifth decision was supposed to be final. Another Hartford employee, Anna K. Davis, became involved with this improper "ongoing review" of Plaintiff's Waiver of Premium claim. Anna K. Davis, whose role in Plaintiff's Waiver of Premium claim remains unknown, made a computer entry, "Having a neuro psych test performed at this time would provide functionality as of the date of testing. . . .  Further clarification of current functionality appears likely to be needed."  (*See* Exhibit "Z" Adjuster Notes).

63.    The assertion that clarification of Plaintiff's cognitive functionality was needed is completely unfounded. In letters to the Plaintiff on January 24, 2013 and on January 30, 2013, stating that neurological testing needed to be done and

27

that failure to submit to exam would result in termination of benefits. The letters stated "If you have had any recent testing or mental health records which are directly related to the condition for which you have submitted a claim, please bring them to the appointment." Once again this language completely ignores the final decision on the Waiver of Premium claim made by Ms. Golych; where less than a month Plaintiff was determined disabled under the policy. There was no request for neuropsychological testing by Ms. Golych, and the decision to approve Plaintiff was based on all medical evidence submitted as well as Dr. Sharif's medical review. (*See* Exhibit "AA" Letters dated January 24, 2013 and January 30, 2013).

64.    Plaintiff was later informed by Balogh that testing "was not done by appeals because the eval would only provide current status and they reviewed to establish disability from the [date of disability] to [Benefit End Date].  Once claim approved, neuropsych eval was needed to verify ongoing disability." Curiously, this testing was performed less than a month after approval and indirect contradiction to the concession by Balogh that she only needed to be re-evaluated on an annual basis. There was no evidence of change in Plaintiff's medical condition between December 5, 2012 and January 3, 2013. (*See* Exhibit "BB" Note from Balogh).

65.    On Friday, March 8, 2013, Dr. Nick DeFilippis traveled from Atlanta, Georgia to Birmingham, Alabama, and rented an upstairs meeting room at the

Redmont Hotel.  The Plaintiff was subjected to nineteen (19) neuropsychological tests (over one-half of which were designed to detect malingering and psychiatric disorders, rather than to measure the cognitive impairment resulting from Parkinson's Disease).  None of the tests were designed to measure the Plaintiff's driving limitations or the effects of stress on Parkinson's Disease symptoms, the two conditions discussed by Dr. Sharif in her Medical Record Review that prompted her statement that no neuropsychological testing had been performed.

66.    The testing was conducted by Dr. DeFilippis over the course of approximately seven hours (9:40 am to 4:30 pm), with only one short bathroom break and no lunch.   The shabby upstairs meeting room rented by Dr. DeFilippis was in the downtown pre-renovated Redmont Hotel, shortly before it was closed. Dr. DeFilippis used a rough wooden folding table on which to conduct the  tests and he and the Plaintiff sat in two metal folding chairs the entire day. The single restroom was connected to the meeting room and little privacy was afforded.

67.    Although the testing was scheduled to last until 6:30 pm, Dr. DeFilippis told Plaintiff on more than one occasion throughout the day that she would have to return for another day of testing if they did not finish the testing that day, giving the Plaintiff a sense of urgency to hurry the testing so she would not have to return on another day.   The testing was conducted manually with a No. 2 pencil and testing booklets, or by using an antiquated cassette recorder and hand

operated clickers rather than a computer.  The tests included many questions about substance abuse, sexual abuse, and other irrelevant personal matters, but sought no information about Parkinson's Disease symptoms.  Though Dr. DeFilippis was courteous and polite, the testing was long, tiring, embarrassing and stressful to the Plaintiff.

68.   On March 13, 2013, Dr. DeFilippis prepared a neuropsychological evaluation ("NPE") based on the test results and the interview with the Plaintiff. [6] Also, he completed the one-page (two pages if the definitions page is considered) Behavioral Functional Evaluation form required by Hartford.   These reports were provided to Hartford on or about March 20, 2013.   The BFE is prefaced by the following instruction:  "To be completed by the Attending Physician." (*See* Exhibit "CC" NPE and BFE forms).

69.   Dr. DeFilippis completed and signed the BFE as a "Physician" and as the Plaintiff's "Attending Physician."  Dr. DeFilippis is not a physician, was never Plaintiff's  Attending  Physician,  and never had  the  opportunity  to  observe Plaintiff's  behavior  or  functionality  to  perform  the  listed  "Activities,"  really "Temperaments"  as  defined  by  the  Department  of  Labor  in  the  Dictionary  of

---

There were several mistakes and inaccuracies in the Plaintiff's personal information contained in the NPE, most notably Dr. Defilippis missed the date the Plaintiff stopped working by one year, reporting it to be on March 31, 2013 rather than March 31, 2012.  A detailed complaint letter was sent by Plaintiff's prior counsel to Hartford, Dr. Defilippis and PsyBar on September 20, 2013, detailing the inaccuracies, but no one ever responded to the letter or corrected the errors.

Occupational Titles, except on March 8, 2013, while he was administering nineteen neuropsychological tests in an upstairs hotel meeting room.  In the BFE, Dr. DeFilippis reported that the Plaintiff had full ability to perform ten of the twelve described "Activities" on the BFE form, and had moderate ability to perform the other two.   He also responded to the inquiry "Define stress for this patient as it relates to an occupational environment:" as follows: "Meeting deadlines or having to speak to others in order to convince them of her opinion."  He also added under "other considerations:," "The primary issues would be how quickly the examinee can complete her tasks." (Exhibit "CC").

70.    The neuropsychological testing performed by Dr. DeFilippis provided no basis for the determination of the Plaintiff's ability to perform the "Activities" (really "Temperaments") described on the BFE, or her ability to perform such "Activities" (or maintain such "Temperaments") on a sustained basis for eight hours.  Also, although he reported limitations in the NPE on the Plaintiff's ability to perform several activities, such as keyboarding and writing, and identified physical symptoms, such as impairment of fine motor skills, Dr. DeFilippis did not report any of the limitations in the BFE.  He also failed to report limitations on the Plaintiff's consistency to perform the "Activity for the eight hour workday." Finally, Dr. DeFilippis failed to report the inconsistencies in performance noted in

his NPE when opining in the BFE, although he was instructed in the BFE to explain any inconsistencies. (Exhibit "CC").

71.    In completing the BFE, Dr. DeFilippis ignored and gave no weight to the 1) medical records provided to him by Hartford; 2) Dr. Standaert's Attending Physician's Statement and amendment, if it was provided to him; 3) the test results reported in the NPE; or 4) the Plaintiff's self-reported symptoms.  Finally, Dr. DeFilippis was not qualified to diagnose or evaluate the physical effects or symptoms of Parkinson's Disease, because he was not a physician, and many of the "Activities" related solely or primarily to physical symptoms.

72.    After the Introduction/Reason for Referral portion of the 15-page NPE, Dr. DeFilippis summarized his review of the records provided to him by Hartford.  Notably missing from his list of medical records reviewed were the most recent office notes of October 26, 2012, and the Attending Physician's Statement of Disability submitted with the long term disability claim and the Application. Also absent from the records reviewed were the Plaintiff's Application, the amendment to the Physician's Statement of Disability, the original denial letter, Plaintiff's October appeal and the December 5, 2012 Final Decision of the Appeal Specialist.  (Exhibit "CC").

73.    Ms. Balogh specifically instructed in the Referral Form to exclude Dr. Sharif's Medical Records Report, despite Hartford's reliance on Dr. Sharif's report

to justify the neuropsychological testing.  Because Dr. Sharif's Report was not related to the neuropsychological testing, there was no reason to leave it out.  Also, the Job Description of the Plaintiff was omitted, although Dr. DeFilippis was asked to give opinions about Plaintiff's functional abilities for activities directly related to her then occupation as an attorney.  Moreover, Dr. DeFilippis was asked to define stress for the patient as it related to her occupational environment, and he gave opinions regarding the same, even though he did not know or understand the requirements of Plaintiff's occupational environment because Hartford chose not to give him the Plaintiff's job description, and despite the fact there were no tests administered for Plaintiff's physical and cognitive reaction to stress.

74.    The results of the nineteen neuropsychological tests administered to Plaintiff revealed no malingering or lack of effort on her part, or any inconsistencies among the medical records, the self-reported symptoms and the test data.  Likewise, in response to Ms. Balogh's second question in the Referral Form, Dr. DeFilippis confirmed the cause of the noted cognitive impairment was Parkinson's Disease, rather than any other psychiatric or organic cause, a fact really never in dispute.

75.    Curiously, Dr. DeFilippis added to his response to Question 2. an interesting description of the effect of Plaintiff's noted impairments on her work.  Consistent with Dr. Standaert's limitations and restrictions, which were confirmed

33

by Dr. Sharif, both of which appear not to have been reviewed by Dr. DeFilippis, Dr. DeFilippis independently reported fine motor impairment, writing problems, and visual motor problems:

> The examinee presents with a fine motor coordination problem and also has a mild visual motor problem. She would have difficulty manipulating apparatus that requires fine motor coordination, particularly if she has to use both hands. The primary issue in the examinee's situation related to this problem is how quickly she would be able to operate a computer keyboard. She would be very slow in doing that and might be prone to making errors. The examinee would be slow in writing and her writing is small but legible. She is estimated to have to take about twice as long to perform the above tasks.

76.     Dr. DeFilippis' findings are consistent with the "Cardinal" motor symptoms of Parkinson's Disease, which include resting tremor, slowness of movement (bradykinesia), postural instability (balance problems), and rigidity. In addition to the "Cardinal" symptoms of Parkinson's, there are many other "Secondary Motor" symptoms associated with the disease such as gait disorder, freezing, unwanted accelerations, and reduced facial expression. "Micrographia," shrinkage in handwriting that progresses the more a person with Parkinson's writes, is also a Secondary Motor symptom occurring as a result of bradykinesia which causes difficulty with repetitive actions. All of these motor symptoms are due to discoordination of movement resulting from the absence of dopamine in the brain, the cause of Parkinson's Disease.

77.    Dr. DeFilippis also missed the mark when he suggested that stress would merely cause a left hand tremor.  Not only is the symptom of resting tremor exaggerated under stress and adverse conditions, as he suggests, but all Parkinson's symptoms are exacerbated under stress.  This means that Plaintiff's cognitive issues and attention disorder would become more pronounced under stress and her writing slower and smaller.  Unfortunately, under stress, a person with Parkinson's Disease will sometimes become unable to function, move or think at all.

78.    On March 29, 2013, Ian Hardy, a new Ability Analyst assigned to the file without notice or explanation to Plaintiff or Vanessa Balogh, and the sixth Hartford employee to appear in the Plaintiff's computer files, made a Termination Recommendation in Plaintiff's Waiver of Premium computer claim file. Ian Hardy recommended that Plaintiff had the "functional ability to perform work," Mr. Hardy necessarily relied solely on the BFE, because the NPE reflected no opinions regarding Plaintiff's "functional ability to perform work."  The NPE reflected only test results and coping skills suggested by Dr. DeFilippis related to the Plaintiff's work as a lawyer, which Hartford admitted Plaintiff could not do.  As shown below, the BFE was rejected by the second Appeal Specialist as improper evidence.  There was no support in the NPE that given her limitations and restrictions Plaintiff "had the functional ability to perform work," and did not

indicate that Plaintiff could perform "alternative occupations." (*See* Exhibit "DD" Adjuster Note).

79.    There is no apparent reason Ian Hardy should have usurped the position of Vanessa Balogh, the assigned Ability Analyst, except to earn another termination/denial for Hartford.  After the termination of the Waiver of Premium, Mr. Hardy never made decisions in Plaintiff's claim file again, and Plaintiff's attempts to call him were futile.

80.    Sometime before April 1, 2013, Vanessa Balogh, the Ability Analyst since the inception of the claim, received Dr. DeFilippis' NPE and BFE and reviewed them.  She made a note on her computer calendar for follow up.  When she was prepared to make her recommendation on the Hartford computer system, she realized someone had beat her to the punch.  On April 1, 2013, she made the following computer entry, "Neuropsych eval completed and results rec'd/reviewed.  Claim recommendation already made for TL review.  Deleted f/up."  Ms. Balogh was apparently surprised and was not aware of Mr. Hardy's appointment as the new Ability Analyst, or of his preemptory analysis and review of the evaluations of Dr. DeFilippis, or his recommendation for termination before she began her review on April 1, 2013. (*See* Exhibit "EE" Adjuster Note).

81.    On April 9, 2013, ten days after Ian Hardy made his recommendation to terminate the Waiver of Premium, Joe Simeone, Manager Sacramento Claim

Management (apparently Mr. Hardy's supervisor), stated that he agreed with Ian Hardy. His basis for agreement of termination was that the initial approval was based on cognitive limitations, which were undetermined at the time of approval, and the BFE from DeFilippis, confirmed she had moderate ability to perform "varied activities". On top of this review already being improper, each of the reviewers relied on one physician's statement from De Filippis who never treated Plaintiff in any capacity, and is a psychologist. (Exhibit "EE").

82.    It is unclear where Joe Simeone obtained the information, "Prior decision by appeals to overturn initial denial was based primarily on cognitive processing issues noted in the UDC report." Additionally, the three "Activities" selected by Joe Simeone were functions specifically difficult for a person with Parkinson's Disease.  Being unable to perform repetitive and short cycled work, is a classic symptom of Parkinson' Disease.  As Dr. DeFilippis pointed out in the NPE, writing and keyboarding are particularly difficult as a result of the absence of certain brain chemicals.  Likewise, performing under stress and being consistent and reliable are two of the most difficult aspects of the Disease.

83.    On April 10, 2013, Ian Hardy advised Plaintiff in a letter that she was no longer eligible for Waiver of Premium benefits. This decision was based solely on DeFillipis examination. Like Dr. DeFilippis, Mr. Hardy did not understand the nature of Parkinson's Disease symptoms. The disconnect is obvious.  The NPE

lends no support to the contention that Plaintiff can "work," the NPE only describes the symptoms as they affected Plaintiff's occupation as an attorney, which Hartford has admitted Plaintiff was not qualified to do, given her limitations and restrictions. Mr. Hardy necessarily relied solely on the BFE in making the termination decision. (*See* Exhibit "FF" Denial Letter for WOP dated April 10, 2013).

84.     During the time of The Hartford's improper "ongoing review" of her December Waiver of Premium approval, Plaintiff decided to initiate the process for Social Security Disability benefits. She applied on January 15, 2013 and less than two months later was approved on March 15, 2013. The SSA stated "We found that you became disabled under our rules on April 1, 2012." (*See* Exhibit "GG" Notice of Award).

85.     The SSA found Plaintiff could not make adjustment to other work because with her limitations and restrictions, and she had no work related skills to perform sedentary work; or that Plaintiff had a psychological impairment that prevented her from doing even simple unskilled work. The SSA has paid Plaintiff disability benefits since its finding on March 15, 2013.  (Exhibit "HH").

86.     Through her counsel, on October 4, 2013, Plaintiff submitted her timely appeal of the April 10, 2013 termination of Waiver of Premium under the Life Insurance Policy (the "Appeal Letter").    After challenging that the

termination of Waiver of Premium justified another appeal since it was done outside the authority of the Life Insurance Policy, Plaintiff listed several other major issues raised in her Appeal Letter. These issues include violation of ERISA for overturning a final decision that Plaintiff was found "disabled", interference and misrepresentation with the appeals process including the final decision, misrepresentations regarding Hartford's right to have Plaintiff submit to testing, use of the improper standard "any occupation" in making its findings of work capacity for the Waiver of Premium, misrepresentation of the role of Dr. DeFillipis as a physician, and a lack of consideration of Plaintiff's complete medical during deliberation of the Waiver of Premium termination. (*See* Exhibit "II" Appeal Letter).

87.    Hartford records reveal that the Appeal Letter was forwarded to Marsha Macko, the same Appeal Specialist assigned when the Complaint Letter was received.  The computer records further reflect that the Appeal Letter was not opened by Ms. Macko until after noon on October 8, 2013.   On October 8, 2013, shortly before noon, however, Ms Macko entered her Initial Appeal Analysis in the Hartford computer system based on her review of the Complaint Letter, rather than the Appeal Letter.  (*See* Exhibit "JJ" Computer Records).

88.    On October 8, 2013, Ms. Macko prepared a "Medical Consultant Referral Form" to MCMC, LLC (Managing Care Managing Cost), requesting a

consultation with a Neurologist (who had experience with Parkinson's Disease) and a Neuropsychologist. MCMC was a consulting company that advertised a variety of managed care programs which provided assistance in the assessment, review and evaluation of insurance claims. The Referral Form reflected that Ms. Macko sent sixty-one (61) pages of medical records to MCMC with the Referral Form, but it is impossible to tell what records were sent for the two reviewer's consideration.

89.     In the Referral Form, Ms. Macko instructed in part as follows:

> This is a request for your independent opinion of this individual's functionality. We are not asking you to determine if the individual is Disabled, which is an insurance contract determination, or if she is able to return to work. We are asking you to provide an objective assessment of the individual's appropriate restrictions/limitations based on your medical records review, your conversation with the attending physician and the individual's self-reported information….

(*See* Exhibit "KK" Referral Form).

90.     Macko's referral from also asked the reviewers to provide an opinion of her capacity for full time or part-time work from April 10, 2013 to the present under the Department of Labor work categories. Interestingly, there are no "DOL work categories," however; there are "DOL Physical Demands Strength Ratings" that have been adopted by the SSA from the DOT. The Strength Ratings are expressed in the following terms: sedentary, light, medium, heavy and very heavy. There are three possible titles that would apply to plaintiff's DOL work category:

40

110.117-034, 110.117-022, and 110.107-010 all of which are categorized as having a strength level of sedentary. (Exhibit "LL"; Exhibit "MM" DOL Work Category Levels).

91.     Hartford computer records revealed that the Appeal Letter and its forty-two attachments were received by Ms. Macko in the afternoon on October 8, 2013.  From the Record it appears that Ms. Macko made no effort for over twenty days to review the Appeal Letter or its attachments, which included additional medical records.  It also appears that she made no effort to focus the Co-Morbid Medical Review on the issues raised by Plaintiff on appeal as stated in her Appeal Letter. (*See* Exhibit "NN" Computer Records).

92.     The Hartford selected two reviewers, Dr. Andrew J. Gordon, a board certified neurologist, and Dr. Christopher P. Contardo who is board certified in clinical neuropsychology. Public information revealed no specialty or special interest of Dr. Gordon or Dr. Contardo in Parkinson's Disease, however. Per the Referral Form, the medical reviewers were instructed to review the sixty-one pages of medical records attached to the Referral Form, and Dr. Gordon was instructed to speak with Dr. David Standaert, the Plaintiff's Attending Physician.  They were to then prepare their Case Reports, answering the questions raised in the Referral Form.

93.     Dr. Gordon reported that he spoke with Dr. Contardo on October 16, 2013 at 8:00 am and told Dr. Contardo what he thought the physical restrictions and limitations for Plaintiff should be.   Dr. Gordon reported that he and Dr. Contardo spoke again on that same day at about 10:35 CST, when Dr. Contardo advised Dr. Gordon that "the claimant's neuropsychological/psychological difficulties would warrant restrictions and limitations on activity."   Dr. Contardo reported in his Case Report that he spoke with Dr. Gordon on October 16, 2013 at 11:40 EST, and Dr. Gordon "agreed there are mild cognitive difficulties that are likely to be exacerbated by high level functioning that would preclude her from high level responsibilities.  We discussed the physical limitations that are present and I deferred to his expertise in that area."  At approximately 7:00 pm on the evening of October 16, 2013, MCMC advised Ms. Macko via email that the "reviewer [Dr. Gordon] was unsuccessful with speaking to Dr. Standaert after three attempts/messages.  How would you like to proceed?" (*See* Exhibit "OO" Dr. Gordon Report and Macko Email).

94.     Hartford computer records revealed that on October 17, 2013, at 1:00 pm, Cheryl Lewis with Dr. Standaert's office called Ms. Macko's office, and asked whether Dr. Standaert should call Dr. Gordon. Ms. Macko told Ms. Lewis that the reviewing doctor would contact Dr. Standaert directly.  Curiously, Dr. Gordon claims to have already attempted to call Dr. Standaert three times.  However, Ms.

Macko failed to provide Dr. Gordon with Dr. Standaert's personal line although it was in the Plaintiff's file. (Exhibit "OO").

95.     Ms. Lewis informed Macko that the best way to contact Dr. Standaert would be through Ms. Lewis.  She left her direct contact numbers to provide to Dr. Gordon (205) 996-2094, the same number Dr. Sharif had used to contact Dr. Standaert, which Ms. Macko had not shared with Dr. Gordon.  On October 17, 2013 at 1:01 pm, Ms. Macko reported on the Hartford computer system:  "Rec'd contact from Vendor who indicated that AP contact with Dr. Standaert was not successful.   Vendor provided with updated contact information."   At 1:04 on October 17, 2013, Ms. Macko emailed MCMC as follows:  "Please be advised that we were contacted by Cheryl Lewis with Dr. Standaert's office. She stated that the best way to reach the Dr. Standaert was through her at phone # (205) 996-2094. Please have the reviewing physician make attempts to reach Dr. Standaert at the updated number provided and through Ms. Lewis.  If verbal communication is not established after 2 attempts, the reviewer may fax his questions to Dr. Standaert at fax # 205-996-6580."  (Exhibit "OO").

96.     Without any reported attempts to call Ms. Lewis at the alternative number to speak to Dr. Standaert, as he was instructed to do, on October 21, 2013, Dr. Gordon faxed a letter to Dr. David Standaert.  After identifying himself as an Independent  Peer  Reviewer,  he  asked  what  neurological  findings  support

Plaintiff's claims of impairment and how do they translate into appropriate restrictions and limitations.

97.    On October 23, 2013, Dr. Standaert responded to Dr Gordon's "questions" as follows:

> I am a board-certified neurologist and specialist in Parkinson disease and movement disorders. I have practiced in this area for more than 20 years. In addition to my present position as Professor and Chairman of Neurology at UAB, I also serve as the Chair of the Scientific Advisory Board of the American Parkinson Disease Association, a member of the Scientific Advisory Boards of the Michael J Fox Foundation for Parkinson Research and the Bachmann-Strauss Dystonia and Parkinson Foundation, a member of the editorial boards for the journals *Movement Disorders* and *Journal of Parkinson Disease*, and serve on a variety of governmental, industry and nonprofit oversight and review panels in this area. I supervise a team of more than 40 neurologists at UAB that provide care through more than 5,000 outpatient visits for Parkinson's and related disorders and 20,000 visits for other disorders each year. I would be happy to forward my CV with further details if this would be useful.
>
> I have treated Ms. Stewart since October 2007 for Parkinson's disease.  At the time I first saw her she had been experiencing difficulty with the use of her left hand, stiffness of her left leg, and a decreased arm swing on the left.  She had been treated by Dr. Pearson with parmipexola, but did not tolerate this very well because it led to excess fatigue.  At the time I first saw her, she was on treatment using neupro transdermal rotigotine system.  I felt that at that time her symptoms were fairly mild, but sufficient to have confidence in a diagnosis of Parkinson disease.
>
> In the six years since diagnosis, she has exhibited a fairly typical degree of progression of her motor symptoms.  When I last saw her in the office on April 26, 2013, she had

considerably more prominent complaints and symptoms. She reported persistent fatigue and difficulty with mental concentration. She said her movements were fairly good in the morning, but she tended to get very slow in the afternoon and had difficulty performing ordinary tasks. With regard to her examination, we use a widely accepted standardized rating scale, the Unified Parkinson Disease Rating Scale (UPDRS) to follow our patients. Her score on the motor component (subscale III) of the UPDRS on April 26 was 40, which indicates a moderate to severe degree of impairment. The individual item subscores making up this scale are available in our record system, if you are interested.

With regard to treatment since her initial visit, we have explored a variety of approaches. At present her treatment includes carbidopa/levadopa, ropinrole, and rasagiline. I would say she has been moderately responsive to these, but we have not been able to achieve the degree of control I consider satisfactory. Indeed, the UPDRS of 40 is clearly suboptimal. The main issue limiting her treatment has been intolerance of dopaminergic medications, with marked fatigue and sleepiness. As you probably are aware this is a common side effect of these medications and often dose-limiting. We have added modafinil as an off-label treatment to combat this problem, but even with this we have not been able to achieve higher dose levels.

In a more global sense, I think it is important to recognize that Ms. Stewart's most troublesome symptoms exemplify the nonmotor symptoms of the disease that are increasing recognized as a major source of disability and reduce quality of life (discussed in a recent article by Duncan et al., Mov Disord. 2013 Oct 7.doi; 10.1002/mds.25664. Fatigue was an early and dominant feature of her disorder and attempts at treatment have only worsen the problem. This has limited our ability to use these drugs and led to a situation where neither the cognitive nor the motor symptoms are optimally managed. With respect of the specific issue of disability, I think it is important to recognize that her career has been as an attorney practicing courtroom law, an environment very intolerant of fatigue and mental or physical slowness. Despite my best efforts over 6

45

years, I do not think she is capable of continuing her former occupation. Although she has been a leader in the field in the past, I would not feel comfortable having her represent me in a critical legal matter in her present state, the probability of an error from fatigue or mental slowness in the setting is simply too high.

Legal practices aside, I think she unquestionably qualifies as having disability under the more ordinary terms of the ADA. In addition to the cognitive symptoms, she has impaired balance with the risk of falling, impaired use of her hands with inability to write, and rigidity, all of which make self-care difficult or impossible much of the time.

I would be happy to provide additional details and records if they would be helpful.

(*See* Exhibit "PP" Letter from Dr. Gordon dated October 21, 2013, Dr. Standaert's Response).

98.   On October 28, 2013, Ms. Macko finally acknowledged receipt of Plaintiff's forty-seven page Appeal Letter and the forty-two attachments, which had been received by her on October 8, 2013. She wrote to Plaintiff's counsel: "This is in regards to Carol Stewart's appeal for Group Life Waiver of Premium benefits and to confirm receipt of your letter dated 10/04/13, which was received in our office on 10/07/13. Although your recent submission  contained duplicate information already contained in Ms. Stewart's claim file, there was also new medical information provided. As such, the date the complete appeal was received in our office has been adjusted to reflected (sic) 10/07/13. Please be advised that this change does not have a material impact on the review of Ms. Stewart's appeal

which is currently open and ongoing."  Ms. Macko signed this letter as "Sr. Appeal

Specialist." (*See* Exhibit "QQ" Computer Docs, Letter to Counsel).

99.    Dr. Gordon's Comprehensive Case Review revealed that he gave no

weight or consideration to Dr. Standaert's October 23, 2013 Response, the

Plaintiff's Application, the Attending Physician's Statement of Disability and

amendment thereto, the original denial, the first Appeal, or the Final Decision on

Appeal.  Also, Dr. Gordon's Case Review also revealed that he did not review the

Appeal Letter.  Dr. Gordon failed to answer the questions posed by Ms. Macko in

the Referral Form and failed to give credit to the Attending Physician's reported

restrictions and limitations and those confirmed by Hartford through Edna

Golych's Final Decision and Dr. DeFilippis' NPE, all of which are medically and

scientifically supported as Parkinson's disease symptoms.  For example, the

reported limitations and restriction related to fine motor coordination and skills

reported by all medical providers in this case were completely ignored by Dr.

Gordon in his Comprehensive Case Review. (Exhibit "OO").

100.  In summary, Dr. Gordon concluded four times and referred to six

medical records in his two-page report that Plaintiff has Parkinson's disease, an

issue not in dispute.  He noted only "some difficulty in gait and strength in left

upper extremity."   He assigned restrictions and limitations to the Plaintiff as

follows: restricted to carrying no more than forty pounds and occasionally no more

than 25 pounds frequently, and restricted to walking no more than thirty minutes per hour for a combined total of two hours per day. (Exhibit "OO").

101. Dr. Contardo reported one telephone conversation with Dr. Gordon, wherein "Dr. Gordon agreed that there are mild cognitive difficulties that are likely to be exacerbated by high level functioning that would preclude her from high level cognitive responsibilities. We discussed the physical limitations that are present and I deferred to his expertise in that area." Dr. Contardo's own opinion from reviewing Plaintiff's file concluded:

> With consideration given to the claimant's overall cognitive situation and functionality, the claimant has the cognitive capacity for full time work that does not require higher level, complex organization and cognitive skills during the period of 04/10/2013 to present. I defer comment on the claimant's physical capacity to the appropriate specialist (Neurology co-reviewer).

(*See* Exhibit "RR" Dr. Contardo Report).

102. Ms. Macko made her appeal analysis final and informed Plaintiff by letter on November 21, 2013 after receiving the co morbid reviewers reports. Significantly, there is absolutely no basis in the record for finding that Plaintiff can lift/carry up to 40 lbs occasionally and 25 lbs frequently. Dr. Gordon totally ignored the undisputed fine motor coordination problem and rigidity among other symptoms clearly documented in the medical records. Furthermore, Ms. Macko omitted a significant and critical portion of Dr. Contardo's Comprehensive Case

Review which further elaborated on the findings of the neuropsychological testing. This omission appears deliberate. (*See* Exhibit "SS" Final Denial of WOP dated November 21, 2013).

103.   The Medical Records Report of Dr. Sharif was not "included" in  the Appeal Specialist's decision.   Rather the IMR was requested and used by Ms. Golych as a mere tool in helping her reach her independent Final Decision.   Also, Dr. Sharif did not "indicate" that formal cognitive testing could help in determining the EE's limitations, she only referred to the absence of neuropsychological testing in the context of driving limitations and referred to the absence of testing when she referred to a statement made by Dr. Standaert regarding Plaintiff's worsening cognitive skills.   She did not recommend testing or limit her Report in any way based on the absence of testing.

104 .  In its final denial The Hartford misrepresented the exchange between Dr. Gordon and Dr. Standaert and completely ignored the finding that Plaintiff is total disabled by the Social Security Administration. While Macko acknowledges it is undisputed that Plaintiff cannot perform her own occupation as an attorney she blatantly disregards the policy definition of "Disabled" under the Life Insurance policy. Plaintiff's objective medical evidence demonstrates that she is unable to

perform work for which she would otherwise be qualified to do based on her education, training, or experience. (Exhibit "SS").

105.   The Hartford's denial is based on three reviews total by Dr. Sharif, Dr. Gordon, and Dr. Contardo. Not only is Dr. Sharif's review only supposed to be considered for cognitive restrictions, but the reviewing neurologists each gave physical restrictions without any medical basis whatsoever. Aside from Plaintiff's treating physician, Dr. Standaert, not a single physician who reviewed her file had any extensive expertise or experience with Parkinson's disease. Finally the gross disregard of the SSA's fully favorable decision that Plaintiff is totally disabled further indicates that The Hartford wrongfully terminated Plaintiff's Waiver of Premium benefits.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A. Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the WOP Plan was both Erroneous and Unreasonable.

106.   Defendant failed to properly evaluate the effect of Plaintiff's pain and fatigue on the ability to perform the duties of any occupation.  In addition to suffering from constant pain, Mrs. Stewart's cognitive impairments would render her ineffective in any work environment.  Defendant primarily relied on the reports of hired medical reviewers to ascertain that Ms. Stewart could perform work  based

on her training, education, and experience.   The findings are contrary to the opinions of her treating physicians.  Furthermore, the paid medical reviewers never examined Ms. Stewart other than Dr. DeFilippis who represented himself as a physician when he was not and was only retained to perform a neuropsychological evaluation, which did not even primarily test for cognitive limitations of Parkinson's disease.   Accordingly, The Hartford's contention that Ms. Stewart failed to prove that she was disabled under the WOP Plan must be rejected as The Hartford's decision to deny Plaintiff's benefits necessarily imposed a standard that was not required by the WOP Plan's provisions.  See *Soucy v. First UNUM Life Ins. Comp.*, 2011 U.S. Dist. LEXIS 27938*89-90.

### B. Defendant's Decision to Deny LTD Plan Benefits was based on an erroneous interpretation of "prior plan" and is in direct contradiction with the unambiguous meaning of the policy.

107.   In making the decision to deny long-term disability benefits to the Plaintiff, Hartford construed and interpreted one sentence of the Disability Policy that it drafted to the exclusion of all other terms and conditions.  The exclusion or limitation relied upon is not referenced or mentioned anywhere in the Plan Summary or anywhere else in the Disability Policy. The disputed provision as interpreted by Hartford is contrary to a more specific provision relating to Pre-existing Conditions limitations on coverage and benefits.  Specifically, the Pre-

existing Condition limitation on coverage and benefits were relevant, but had expired and no longer could affect Plaintiff's long term disability claim.

108.   Moreover, in its interpretation of the sentence at issue, Hartford ignored the meaning of defined terms it assigned in the Disability Policy and applied a strained and illogical construction to the sentence to deny Plaintiff's claim. The pre-existing provision only excluded on the basis of treating under a "prior plan", not a prior policy. Plaintiff's Long-term disability plan was in full force and effect by Sun Life when she started receiving partial disability, and is the same plan administered by The Hartford currently due to the fact that it never changed to a new plan; rather the funding mechanism for the plan Plaintiff was an is eligible under.

109.   If the language and intent of the agreement is clear and unambiguous, the Court should examine the disputed provision and interpret the provision in accordance with the written word and intent.  The Court is to afford the individual words and terms their plain, ordinary and popular meaning (unless a term is a defined or technical term under the Disability Policy), and apply the terms strictly as written.   Also, the Court should enforce unambiguous clauses in accordance with the insured's reasonable expectations, if the Court determines the Policy provides only illusory coverage.

110.   On the other hand, when language of an insurance policy is susceptible to more than one reasonable interpretation, the language will be deemed ambiguous and should be construed against the insurer that drafted the language.  However, the Court should not pervert the plain language of the Policy to create an ambiguity where none exists.  Likewise, the Court should not accept as reasonable an interpretation that is strained, forced, unnatural or one that would lead to an absurd result.

111.   In summary, on *de novo* review, general contract principles and specifically, general insurance contract interpretation principles, control the interpretation of the Disability Policy.  The evidence in Plaintiff's claim file will demonstrate that Hartford's interpretation of the provision at issue was "*de novo* wrong,*"* and the Plaintiff was entitled to long term disability benefits.

### C. Defendant's Decision to Deny WOP Plan Benefits was not Supported by Substantial Evidence.

112.   In its consideration of Ms. Stewart's claim, Defendant only retained paid consultants to review her file. Defendant bases its denial entirely on the allegation that Ms. Stewart's medical records do not demonstrate that her disabilities make her unable to work at any position, yet it never sought even one independent physical examination.  Further, in denying Ms. Stewart's claim, The Hartford failed to give proper weight to the medical evidence provided by her treating physicians.

53

1.  <u>Defendant's Reliance on Paper-Reviews to Deny Benefits on the
    Basis of Insufficient Evidence Was Arbitrary and Capricious.</u>

113.   Ms. Stewart's claim file is replete with medical records from her treating physicians extensively detailing her disabilities throughout 2007 and up to Defendant's final November 2013 denial.  Ms. Stewart's physicians' assessments, as well as the testing, treatment procedures, and medications they prescribed and administered all demonstrate that Ms. Stewart's Parkinson's disease is extremely debilitating and deteriorating in nature.

114.   The records of Ms. Stewart's long-standing medical providers, who have no stake in the outcome of the case, clearly evidence that she is disabled based on their numerous personal examinations, testing, and procedures.   The Hartford's hired medical reviewers, on the other hand, did not examine Ms. Stewart.  The conclusion that Ms. Stewart was not disabled was based merely on hired reviewers' assessment of her paper medical records. The only physician who examined Ms. Stewart was to do so on a neurological basis and had no expertise whatsoever in Parkinson's disease impact on functionality. In fact not a single paid reviewer had any specialized knowledge of Parkinson's disease and its impact on functionality.  *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002)(finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance

company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005)("[w]ether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

115.   In weighing the opinions of Ms. Stewart's providers against those of the independent reviewers retained by The Hartford, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual."  While *Nord* provides that this Court is not required to adopt a per se rule to treat Ms. Stewart's physicians' opinions with more weight than those of Defendant's medical assessors, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,*

No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005);  *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

116.   Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.  Clearly, in Ms. Stewart's case, these decisions indicate that her own medical physicians' evaluations should be afforded far greater weight than those of Defendant, especially since Defendant's reviewers never bothered with even one of the multiple physical exams allowed by the Plan to assess her physical limitations.

56

(See Exhibit "A", "B" The Plan).   Accordingly, Defendant's denial of Ms. Stewart's WOP benefits, based on insufficient evidence, was arbitrary and capricious.

> 2.   Defendant's Failure to Properly Credit Ms. Stewart's Well-Documented Subjective Complaints Was Arbitrary and Capricious.

117.   Ms. Stewart's treating physicians, who have no financial stake in the outcome of her claim, reached the opinion that she is disabled based on their numerous examinations of her.   The opinion of Dr. Standaert, a specialist in his respective field, is consistent with the objective medical evidence in Ms. Stewart's claim file, including MRI's, examinations and lab results.   The Social Security Administration also found that the opinions of Ms. Stewart's physicians credible and consistent with the other evidence of record and found Ms. Stewart totally disabled and entitled to SSDI benefits.

118.   Instead of giving greater weight to the opinions of Ms. Stewart's treating physicians, The Hartford manufactured support for its termination based upon the opinions of unqualified reviewers it utilized to conduct the improper review.   Neither of The Hartford's physicians Dr. Sharif, Dr. Gordon, or Dr. Contardo examined Ms.  Stewart; they were simply paid by The Hartford to come to the predetermined conclusion that Ms. Stewart is not disabled.

119.   The baseless findings of The Hartford's non-examining salaried employee physicians and consulting physicians stand alone as the only findings in Ms. Stewart's file suggesting that she is not disabled and are overwhelmed by the numerous treatment records and the opinions of her treating physicians suggesting the opposite.

120.   Hartford's termination of benefits was unsupported, made in bad faith and ignored the full record in this matter.

121.   As of this date, Hartford refuses to pay benefits rightfully owed to Ms. Stewart under the policy at issue.

2.   Defendant's Failure to Properly Credit Ms. Stewart's Well-Documented Subjective Complaints Was Arbitrary and Capricious.

122.   Admittedly, some of Ms. Stewart's disabling impairments have subjective components; however, they have been diagnosed by her treating physicians based on her medical history, extensive testing, and physical examinations.   Defendant far exceeds its discretion to ascertain Ms. Stewart's credibility by characterizing the bulk of her treatment records as somehow flowing from her own subjective reports of pain, and thus equally subject to rejection as non-credible.

123.   In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224  (D. Conn. 2004), the Court held "[w]here the record reveals well-documented

complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints."

124.    An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.,* 35 F.3d 382, 387 (9th Cir. 1994); *see also May v. Metro. Life Ins. Co.,* 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan."); *see also Duncan v. Continental Cas. Co.,* 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective medical evidence" to support her disability claim).

125.    In *Creel v. Wachovia Corp.,* No. 08-10961, 2009 U.S. App. LEXIS 1733, 2009 WL 179584 (11th Cir. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel,* the plaintiff applied for disability benefits

based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7.

126.   Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS

1733, [WL] at *8.  Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

127.  Here, Ms. Stewart provided extensive objective and subjective evidence of her disability due to Parkinson's disease. It is well documented that she was involved in a high stress occupation, which only exacerbated the symptoms of the disease. Although Hartford had paid medical reviewers consider her file, those reviewers never actually examined Ms. Stewart for her physical limitations, and they failed to provide any valid independent basis for their conclusion that she is not disabled under the Plan especially since there was never an employability analysis performed or a job description provided to these reviewers.  Here, Ms. Stewart has provided subjective evidence *and extensive objective evidence*, all supporting her claim of disability as defined in the Plan.  Accordingly, Defendant's decision to deny disability benefits was substantively unreasonable.

3.  <u>Hartford Unreasonably Failed to Properly Consider Ms. Stewart's Non-Exertional Limitations.</u>

128.   Ms. Stewart has provided credible medical evidence that she is unable to focus, lacks memory, and is fatigued by any activity even if slight in nature. All of these cause even more symptoms of confusion, fatigue, and anxiety.

129.   Courts must consider a plaintiff's non-exertional limitations, including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

130.   Ms. Macko improperly changed the Plaintiff's medically diagnosed cognitive impairment to "subjective self-reported symptoms."  By intentionally leaving out the phrase used twice by Dr. Sharif in her opinions, "that she herself and Dr. Standaert have," and by focusing on the sentence about the Plaintiff's concerns as reported by Dr. Standaert to Dr. Sharif, Ms. Macko implemented the subterfuge that Plaintiff's cognitive symptoms were  "subjective self reported symptoms" rather than documented classic symptoms of Parkinson's Disease." Ms. Macko ignored the fact that Ms. Golych, Ms. Davis, Ms. Balogh and Mr.

Simeone had all recognized the cognitive issues as more than "subjective self reported symptoms." The fact that Dr. Sharif "found" that there was "slowed cognitive processing" and the "insured has cognitive processing issues" means that they were not "subjective self reports of cognitive limitations." This ploy was an abuse of discretion, an arbitrary and capricious act, and amounted to bad faith claims handling.[7]

131. The evidence, therefore, plainly shows that that Ms. Stewart's non-exertional limitations, even without her exertional limitations which Defendant's own reviewers acknowledge require numerous accommodations, clearly preclude her participation in any gainful occupation, much less an occupation based on her age, education, and experience. It was, therefore, unreasonable for Hartford to completely ignore the impact of Ms. Stewart's non-exertional limitations in its denial.

4.   <u>Defendants' Denial is Contrary to that of the Social Security Administration's Determination that Plaintiff is disabled.</u>

132. In contrast to Hartford's medical consultants' findings that plaintiff's medical impairments would still allow her to perform sedentary or light work, the

---

[7] Ms. Macko intentionally omitted from her Final Decision the portion of Dr. Contardo's report that discussed the cognitive impairments arising from Parkinson's Disease proved by Dr. DeFilippis' neuropsychological testing. Also, Ms. Macko intentionally omitted portions of Dr. Gordon's review that referenced Dr. Standaert's response concerning cognitive impairment. By characterizing the cognitive impairments as "subjective self reported symptoms," rather than objective diagnosed medical symptoms, Ms. Macko apparently thought she could essentially dismiss such symptoms from her Final Decision.

Social Security Administration found plaintiff disabled and granted her Social Security Disability benefits. The Social Security Administration's disability decision should be a "significant factor" in a Court's consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn,* 461 F.3d at 669. *See also Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless").

133.   Even though a favorable decision in a Social Security disability appeal does not make a claimant automatically entitled to disability benefits under an ERISA plan:  [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious. *Bennett v. Kemper Nat. Services, Inc.,* 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009).

134.  Here, the plan required the plaintiff apply for Social Security disability benefits.  Plaintiff signed a formal agreement acknowledging Defendants' right to offset her LTD benefits by Social Security benefits and her obligation to repay any overpayment of LTD benefits resulting from a later award of Social Security benefits. Defendants were on notice of the favorable decision, but in the

termination letters, failed to explain why a conclusion contrary to that of the Social Security Administration's finding of disability was reached. The "mere mention of the [Social Security] decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett,* 514 F.3d at 553, n.2. All three *Bennett* factors weigh against Defendants' decision to deny plaintiff's benefits.

135.   The Sixth Circuit has held that it is "totally inconsistent" to require a claimant to apply for Social Security disability benefits, avail itself of the SSA's determination and, at the same time, contend that the claimant is not disabled. *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, (6th Cir. 2003) (partially overruled on other grounds by *Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)). Although an ERISA plan administrator is not bound by an SSA determination finding of total disability, it is inappropriate for a plan administrator to discount an SSA award in making benefit determinations, especially when the claimant was required to apply for SSA benefits. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 553(6th Cir. 2008). Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294-95(6th Cir. 2005).

65

136.   In *Darland v. Fortis Benefits Insurance Company,* 317 F.3d 516 (6th

Cir. 2003), the Sixth Circuit held that a court should consider a favorable social

security decision as evidence that an insurance company acted arbitrarily and

capriciously by requiring a claimant to apply for social security, then ignoring the

favorable social security decision. The Court explained:

> [I]t is totally inconsistent for Fortis to request that Darland apply for social
> security disability benefits, yet avail itself of that social security
> determination regarding disability to contend, at the same time, that he is not
> disabled. ... Though not directly applicable in this case, the principles of
> judicial estoppels certainly weigh against Fortis taking such inconsistent
> positions.

317 F.3d at 530.

137.   Plaintiff requests that this Court adopt the reasoning in *Melech* from

the Eleventh Circuit. The court examined the juxtaposition between a defendant

insurer's self-interested SSD benefit policy requirements and its failure to give a

SSA decision appropriate weight in its own disability denial determination under

that same policy.  *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir.

2014).  On appeal, the *Melech* Court described defendant LINA's policy in that

case as follows:

> To summarize, the Policy effectively requires all claimants to apply for
> SSDI [Social Security Disability Income] at the outset; if a claimant fails to
> do so, LINA can reduce her benefits under the Policy, if any, by the amount
> of SSDI LINA says she could have gotten. In the event that LINA decides to
> pay a claim, the Policy allows LINA to hold the claim open, at least with
> respect to the total amount LINA must pay, until the SSA reaches a final

66

decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because--having decided to pay the claim--every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LINA, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "*that LINA had an obligation to consider the evidence presented to the SSA.*"  *Id.* at 666 (emphasis added).  The Court went on to state that "in light of these openly self-interested efforts, *we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.*"  *Id.* at 674  (emphasis added).

138.   In the matter at hand, the Plan required Ms. Stewart to apply for Social Security disability benefits and exhaust the highest level of SSA appellate review in the event such SSD benefits were initially denied.  Further, like the defendant insurer in *Melech*, Hartford's decision to terminate Ms. Stewart's benefits completely ignored the SSA' findings which in light of these circumstances, was particularly egregious.

139.   Further, in stark contrast to Hartford's prior findings; the Social Security Administration found Ms. Stewart disabled and granted her SSD benefits

67

on initial application.   Though Ms. Stewart's claim for disability was strong enough to overcome the daunting odds for a Social Security claimant and be approved on initial application Hartford simply has not addressed the favorable decision.[8]   The Hartford should give the Social Security decision great weight and it should be a significant factor in Hartford's decision.

140.   When considering whether a claimant is disabled under sections 216(i) and 223(d) of the Social Security Act, the agency must determine whether the claimant has the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

141.   Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).   The steps are followed in order.   If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

142.   At step one, the agency must determine whether the claimant is engaged in substantial gainful activity (20 CFR 404.1520(b)).   If an individual

---

[8] Historically only 35% of Social Security disability claims are initially approved. (*See* Social Security Admin., 2011 Disabled Worker Beneficiary Statistics, at www.ssa.gov)

engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, or work experience. If the individual is not engaged in SGA, the analysis proceeds to the second step.

143.   At step two, the agency must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).   An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

144.   At step three, the agency must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled. If it does not, the analysis proceeds to the next step.

145.   Before considering step four, the agency must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).   An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite limitations form his or her impairments.

146.   Next, the agency must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work (20 CFR 404.1520(f)).   The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.   If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

147.   At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the agency must determine whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.   If the claimant is able to do other work, he or she is not disabled. If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.

148.   Under the terms of the policy at issue, Ms. Stewart only has to prove that she is unable to perform work based on her age, education, and experience.

Similarly, to be disabled under the Social Security regulations, she had to prove that she is <u>unable to perform any work that she has performed in the past 15 years and that she is unable to adjust to other work considering her residual functional capacity, age, education and work experience</u>.   Clearly the SSA's definition of disability is more stringent than the definition of disability in this policy. Nevertheless, Hartford fails to even acknowledge an award of SSD benefits despite expending great effort to ensure that Ms. Stewart pursued SSD benefits.  It appears that the interest in Ms. Stewart's favorable decision was only to the extent that Hartford might financially benefit from her award.

### D.      Defendant Breached their Fiduciary Duties Owed to Ms. Stewart

149.   The Hartford, as a fiduciary, is required to discharge its duties with respect to the plan solely in the interest of Ms. Stewart, for the exclusive purpose of providing benefits to her. Furthermore, The Hartford's own ability analyst, Edna Golych, made a final decision on the Waiver of Premium claim to approve benefits based on Dr. Standaert's restrictions and Dr. Sharif's neurological evaluation. Vanessa Balogh committed a complete breach of fiduciary duty when ordering an IME to further review Ms. Golych's decision, which pursuant to Hartford's own policy was final.

150.   While engaging in the improper review of Ms. Golych's decision, Vanessa Balogh, and Ian Hardy only relied on Dr. Defilippis' BFE that he filled out as a treating physician, when he in fact was only an examining psychologist completely lacking any specialty in Parkinson's disease.  Also   Dr.   DeFilippis examination of Ms. Stewart was not sufficient to offer an opinion on whether or not she could perform work based on her age, education, and experience. The Hartford intentionally did not provide plaintiff's job description to Dr. DeFilippis to consider in its review nor did it perform any employability analysis whatsoever in its entire review of her waiver of premium claim that Ian Hardy could have relied on, and in fact needed to form the opinion she was able to do any occupation, much less her own. "Any occupation" is also the incorrect standard under Hartford's policy for the Waiver of Premium claim.

151.   In fact, it's evident that Ian Hardy served as nothing more than Hartford's hatchet man in wrongfully denying benefits to Ms. Stewart. Ian Hardy was the seventh Hartford claims handling employees out of an ultimate total of ten (not counting administrative personnel) to be involved in Plaintiff's Waiver of Premium claim.  In social media, Ian Hardy reported that from November 2010 through 2013 and to present, he was a Senior Long Term Disability Analyst with Hartford.  He reported on LinkedIn that in his job with Hartford as a Senior Long Term Disability Analyst, he did the following:

72

* Led team responsible for a 30% reduction in Waiver of Premium claims (Life Insurance) resulting in a savings in excess of $3 MM in twelve months

* Manage Risk reviews for over 350 files while maintaining file compliance

* Exercise expense management through investigation, appropriate follow up, case management, and claim settlements while staying compliant with ERISA and HIPAA

* Assisted with management of Best Practices Reviews

***

Hardy's LinkedIn profile also stated "I am currently responsible for the investigation and adjudication of claims of varying medical complexity to ensure that liability is properly assessed and determined to ensure that claims are properly paid. Of the 350 + files I manage, my claimants come from small law firms and medical offices to multi-national corporations. . . .I thrive on the challenge of finding optimal outcomes for my customers while positively impacting my company's bottom-line."

152. In other words, Ian Hardy was Hartford's hired gun. Leading the team responsible for a 30% reduction in Waiver of Premium (Life Insurance) claims in twelve months to result in a savings in excess of $3 MM for Hartford was a feat worth bragging about on LinkedIn. Ian Hardy performed his job ruthlessly, and in violation of ERISA law and all ERISA and Hartford guidelines and rules.

73

153.   It is interesting to note that Mr. Hardy's experience is as a long term disability analyst and not a Waiver of Premium expert.  This probably accounts for his treatment of the Waiver of Premium claim in this case as a "continued disability" determination rather than a "remains Disabled" determination.

154.   The Hartford's breach of fiduciary duty in processing this claim is even further evidenced by Marsha Macko's conduct. Rather than conducting a review of Ian Hardy's April 10th termination decision (along with the issue that Hartford had no right to subject the Plaintiff to unnecessary neuropsychological testing), which were the only issues before her, Ms. Macko improperly undertook a critical analysis of Ms. Golych's December 5, 2012 Final Decision. Through the process of the appeal where she was to afford Plaintiff a full and fair review of Ian Hardy's termination decision, Ms. Macko wrongfully overturned the prior Final Decision, rather than reversing Ian Hardy's termination decision.

155. In her Initial Analysis of the appeal entered into the Hartford computer system on October 8, 2013, which was adopted by Ms. Macko in her November 21st Final Decision almost verbatim, Ms. Macko did not mention the name of "Ian Hardy" and did not address Ian Hardy's role in the termination of the Waiver of Premium.  Ms. Macko only referred to the "Claims Team."  On the other hand, Ms. Golych's name and her position were used repeatedly by Ms. Macko in her analysis, in her effort to justify the differences in the two Final Decisions on

appeal and her reversal of the prior Final Decision, which was a complete breach of fiduciary duty.

156.   Ms. Stewart is entitled to monetary compensation for Hartford's breach of its fiduciary duties owed to her.  In *Kenseth v. Dean Health Plan, supra, 722 F.3d 869*, plaintiff had surgery after speaking by telephone to a customer service representative at her health insurance provider who erroneously informed her that the procedure was covered by insurance. The Seventh Circuit stated that *Amara* "substantially changes our understanding of the equitable relief available under *section 1132(a)(3)*. Kenseth has argued for make-whole relief in the form of monetary compensation for a breach of fiduciary duty from the start of this litigation ... in appropriate circumstances, that relief is available under *section 1132(a)(3). See in Cigna Corp. v. Amara, 131 S. Ct. 1866,1881-82, 179 L. Ed. 2d 843 (2011)"*.

157.   Furthermore, Plaintiff is also entitled to injunctive relief due to the breach of fiduciary duty by Hartford. The Supreme Court held in *Varity*, that a breach of fiduciary claim "functions as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489 (1996).  The Sixth Circuit echoed Varity by clarifying that relief under § 502(a) (3) is meant to focus on whether the

relief makes a Plaintiff whole rather than the misconduct of the Defendant. *Rochow v. Life Ins. co. of N. Am.* No. 2:04-cv-73628 (5th Cir. 2015).

158.    Plaintiff's condition, Parkinson's disease, is incurable and will not get better overtime.  Due to the nature of the Plaintiff's condition, the evidence that she clearly was entitled to these benefits and still is under the plan provisions, she is entitled to have her insurance re-instated.  This is particularly important in Plaintiff's case, since to deny her reinstatement would be highly inequitable due to the fact that she is no longer insurable.  The wrongful denial of benefits and the fact of uninsurability are separate and distinct injuries for which payment of monetary damages is inadequate to fully compensate Ms. Stewart. Therefore, injunctive relief is appropriate in this case.

## E.    Deference Should Not Be Afforded to The Hartford's Claim Decision.

159.  The Hartford engaged in improper claims handling procedures throughout processing Ms. Stewart's claims for waiver of premium benefits and long-term disability benefits. These procedures include not electing a forty five day extension, reviewing her more frequently than on an annual basis after approval, and Ms. Stewart's inability to be able to respond or comment to the new evidence and rationale after Ms. Golych's decision was overturned.  The long-term disability denial based on Hartford's interpretation of "prior plan" should not be shielded by the arbitrary and capricious standard since it goes well outside the scope that the

policy provided for the administrator and amounts to a legal conclusion. It is well settled that violations of the regulatory requirements under ERISA triggers loss of the deferential review that is normally afforded to plan administrator's. *Halo v. Yale Health Plan*, 49 F. Supp. 2d 240, 269 (D. Conn. 2014).  The irregularities in which The Hartford handled Ms. Stewart's claim warrants the application of a de novo standard.

## CAUSES OF ACTION

### COUNT ONE
### ERISA (Claim for Benefits Owed under Plan)

160.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

161.   At all times relevant to this action, Ms. Stewart was a participant of the Long-Term Disability Policy No. GLT024554 ("the Plan") ("the Plan") within the meaning of 29 U.S.C. §1002(7), and was eligible to receive disability benefits under the Plan including policies GLT-869923 and GL-86992.

162.   As more fully described above, the refusal to pay Ms. Stewart  Long-term disability and waiver of premium benefits under the Plan for the period from at least on or about April 2012 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA.  Defendant's decision to deny

Ms. Stewart's benefits constitutes an abuse of discretion as its decision was not reasonable and not based on substantial evidence.

163.   Ms. Stewart brings this action to recover benefits due to her and to enforce her rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

**COUNT TWO**
**ERISA (Claim for Breach of Fiduciary Duty Pursuant to ERISA § 502(a)(3),**
**29 U.S.C. § 1132 (a) (3))**

164.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

165.   ERISA § 404(a), 29 U.S.C. § 1104 (a), requires that a fiduciary discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

166.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a plan participant to file suit to obtain injunctive and other appropriate equitable relief from a violation of ERISA, including the fiduciary duty provision.

167.   Defendant breached its fiduciary duty to Ms. Stewart by acts and omissions including, but not limited to, improperly reversing a final decision of approval and erroneously and unreasonably terminating benefits.

168.   As a consequence of these and related acts and omissions by Defendant, Ms. Stewart suffered harm including, but not limited to, loss of benefits for covered disabilities and increased expense of medical treatment incurred during the time period that the Defendant failed to notify her of her rights.  Ms. Stewart suffered damages as a direct and proximate result of Defendant's breach of its fiduciary duty.

169.   Ms. Stewart seeks make-whole relief in the form of monetary compensation for Defendant's breach of its fiduciary duties owed to her, as well as any and all other relief she may be entitled.

## COUNT THREE
## (INJUNCTIVE RELIEF)

170.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

171.   At all times relevant to this action, Ms. Stewart was a participant of the Long-Term Disability Policy No. GLT024554 ("the Plan") ("the Plan") within the meaning of 29 U.S.C. §1002(7), and was eligible to receive disability benefits under the Plan including policies GLT-869923 and GL-86992.

172.   As more fully described above, the refusal to pay Ms. Stewart  Long-term disability and waiver of premium benefits under the Plan for the period from at least on or about April 2012 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA.  Defendant's decision to deny Ms. Stewart's benefits constitutes an abuse of discretion as its decision was not reasonable and not based on substantial evidence.

173.   Ms. Stewart brings this action to recover benefits due to her and to enforce her rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

174.   Ms. Stewart requests injunctive relief to reinstate her Waiver of Premium benefits since she is no long insurable, her policy is still effective, and she remained eligible under the plan since April 2012 to the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.   The applicable standard of review in this case is *de novo*.

2.   That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.   From at least April 2012 through the present, Ms. Stewart met the Plan's definition of "Disabled";

4.     Defendant shall pay Ms. Stewart all benefits due for the period from at least April 2012 through the present, in accordance with the Plan;

5.     Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.     Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.     Defendant shall pay attorney's fees for Plaintiff's counsel;

8.     Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully Submitted,


_/s/ Peter H. Burke_____
Peter H. Burke (ASB-1992-K74P)


_/s/ Jessica A. Hayslip_____
Jessica A. Hayslip, Esq. (ASB-2464-E98L)


**OF COUNSEL**:
**BURKE HARVEY, LLC**
3535 Grandview Parkway
Suite 100
Birmingham, Alabama 35243
Phone: 205-930-9091
Fax:   205-930-9054
pburke@burkeharvey.com
jhayslip@burkeharvey.com

**<u>PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:</u>**

Hartford Life and Accident Insurance Company
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL  36104