FILED
2021 May-06  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CAROL H. STEWART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-CV-01423-KOB** |
| | ) | |
| **HARTFORD LIFE & ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Carol Stewart, like many American workers, participated in an employee-benefit plan that her former employer, the law firm of Burr & Forman, LLP, sponsors. Defendant Hartford Life & Accident Insurance Company administers claims and pays benefits under the plan, and the Employee Retirement Income Security Act of 1974 (ERISA) governs the plan. The Hartford plan provides several benefits for disabled plan participants, including long-term disability insurance and waiver-of-premium benefits for its life insurance policy. This ERISA case involves Ms. Stewart's attempts to secure those benefits.

In 2007, Ms. Stewart's physician diagnosed her with Parkinson's disease. At that time, Burr & Forman sponsored a disability insurance policy for its employees insured by the Sun Life Assurance Company of Canada. In 2009, Sun Life began paying Ms. Stewart partial long-term disability benefits under its disability policy. In 2010, Burr & Forman terminated the Sun Life disability policy and transitioned both disability and life insurance policies to Hartford. And finally, in 2012, two important events occurred: Sun Life began paying Ms. Stewart total long-term disability benefits under its disability policy; at the same time, Ms. Stewart filed claims for

1

total long-term disability benefits and for life-waiver-of-premium benefits under the Hartford

disability and life policies. Hartford denied both claims. Those denials led to this case.

Nine years later, this ERISA case—which Ms. Stewart filed in 2017—has finally reached

the judgment stage, and the parties have filed their cross-motions for judgment on the pleadings

after engaging in extra-record discovery (*see* doc. 61; 83). But Ms. Stewart hotly contests the

facts of this case, so she has also filed a so-called "Motion to Strike and/or Evidentiary

Objection." This case now comes before the court on those three motions.

As discussed more fully in this Opinion, the court concludes that Hartford properly gave

Ms. Stewart a full and fair review of both her long-term disability and waiver-of-life-premium

claims and acted within its discretion in denying those claims. Accordingly, the court will **DENY**

Ms. Stewart's motion for judgment (doc. 96), will **GRANT** Hartford's motion for judgment

(doc. 95), and will enter judgment for Hartford. And because Hartford properly presented the

extra-record evidence in this case—or, at least because Ms. Stewart did not properly challenge

that evidence—the court will **DENY** Ms. Stewart's motion to strike (doc. 103).

## I.      Ms. Stewart's Motion to Strike / Evidentiary Objections

For sake of clarity, the court will begin its analysis with Ms. Stewart's "Motion to Strike

and/or Evidentiary Objections" (doc. 103). This presentation allows the court to resolve the

disputed factual issues before it sets out its factual narrative, which in turn promotes

transparency in that the court will actually consider all facts set out in the narrative in making its

ruling on the motions for judgment.

Before addressing the arguments Ms. Stewart raises in her filing, the court notes here that

she had no authority under which to submit that filing. Federal Rule of Civil Procedure 12(f),

which governs motions to strike, allows the court to "strike from a *pleading* an insufficient

defense or any redundant, immaterial, impertinent, or scandalous matter." (Emphasis added). But because *briefs* are not "pleadings" for the purposes of Rule 12(f), courts in this Circuit generally do not entertain motions to strike briefs. *See, e.g.*, *Jordan v. Cobb Cnty.*, 227 F. Supp. 2d 1322, 1346 (N.D. Ga. 2001) ("Rule 12(f) applies only to matters within the pleadings"); *Eubanks v. Henry Cnty.*, No. 1:11-CV-3969-AJB, 2013 WL 11971258, at *1 (N.D. Ga. June 20, 2013) ("a motion to strike a brief in response is inappropriate and should be denied"). Ms. Stewart maintains, however, that she only submitted the filing as a "motion to strike" because she "prepared [it] as an Evidentiary Objection to some of Hartford's alleged facts, but the Court's ECF menu did not provide an option to file the document in this manner." (Doc. 107 at 1).

But Ms. Stewart did not have the authority to submit a separate "evidentiary objection" in this case, either. Ms. Stewart asks this court to sustain her evidentiary objections because Hartford included "inadmissible evidence" in its Statements of Undisputed Facts. (Doc. 103 at 1). And courts generally *do* allow a party challenging the admissibility of evidence to file an objection to that evidence. *See, e.g.*, *Jordan*, 227 F. Supp. 2d at 1346 ("[t]he proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony, not a motion to strike") (citations omitted). But the Federal Rules of Evidence and their admissibility provisions do not apply to ERISA cases. *See, e.g.*, *Herman v. Hartford Life & Acc. Ins. Co.*, 508 F. App'x 923, 928 (11th Cir. 2013) (Table) ("[t]he Federal Rules of Evidence…do not apply to an ERISA administrator's benefits determination, and [courts] review the entire administrative record…") (quoting *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 n.3 (7th Cir. 2009)).

Instead, in ERISA cases courts consider "the facts known to the administrator at the time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th

Cir. 2008) (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)). *See also Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1312 (11th Cir. 2016) ("[i]t is well established that in reviewing a denial of ERISA benefits, the *relevant evidence* is limited to the record before the administrator at the time the decision was made") (emphasis added). And *nowhere* in her evidentiary objection does Ms. Stewart claim that Hartford supported its arguments with facts not known to the administrator at the time it made its decision. (*See* doc. 103). Instead, she makes frivolous and dilatory objections to statements in Hartford's brief and to its interrogatory responses. And as to the evidence in this case, she merely quarrels with the conclusions Hartford draws from that evidence and the interpretations it gives to that evidence. But this court provided Ms. Stewart an avenue to challenge Hartford's interpretations of the record: in her Response brief allowed by Appendix II to this court's ERISA Order (doc. 25 at 13, 16). That Order explicitly states that "[a]ll material facts set forth in the statement requirement of the moving party will be deemed to be admitted…unless controverted by the *response* of the party opposing [judgment]." (Doc. 25 at 16) (emphasis added).

Accordingly, the court concludes that it has no obligation to entertain Ms. Stewart's "evidentiary objections" and agrees with Hartford that the filing constitutes nothing more than a "blatant attempt to avoid the *already extended* page limitation for Reply Briefs in this case." (Doc. 106 at 2) (emphasis in original). But because Ms. Stewart's objections also fail on their merits, the court, out of an abundance of caution and to give Ms. Stewart the benefit of the doubt, will explain those reasons.

Ms. Stewart brings three primary challenges in her filing: (1) she challenges the "Introduction and Headings" in Hartford's brief on its motion for judgment (doc. 95-1); (2) she brings a variety of challenges to Hartford's interrogatory responses (doc. 95-2; 95-3); and (3) she

brings a litany of arguments on the merits of this case that she has characterized as "evidentiary objections." (*See* doc. 103 at 2–11). The court will address each of these challenges in turn.

### A.    *Introduction and Headings*

Ms. Stewart first challenges the introduction in Hartford's "Memorandum of Law in Support of its Motion for Judgment" (doc. 95-1 at 1) and the headings Hartford included in its "Statement of Undisputed Facts" in that filing (doc. 95-1 at 10, 11, 15, 16, 19). Appendix II of this court's standard ERISA Order requires a brief on a motion for judgment to "begin with a statement of allegedly undisputed relevant material facts set out in separately numbered paragraphs." (Doc. 25 at 15) (emphasis omitted). According to Ms. Stewart, Hartford violated Appendix II because it opened its brief with a one-page introduction and included argumentative headings in its Statement of Undisputed Facts. (Doc. 103 at 1–2). Hartford responds that it "[did] not read Appendix II to forbid the inclusion of a brief introduction." (Doc. 106 at 6).

The court agrees with Hartford and will not disregard Hartford's introduction or the headings in its Statement of Undisputed Facts. Hartford included its introduction and headings on *numbered* pages; Hartford used its page allocation as it saw fit and in compliance with Appendix II. It did not, for example, use the introduction as a mechanism to make merits arguments outside of Appendix II's page limitations. Unfortunately, it appears to the court that Ms. Stewart, on the other hand, included her objection to Hartford's introduction and headings to disguise the true purpose of her pleading: an effort to make additional merits arguments outside of the briefing allowed by Appendix II and this court's Briefing Schedule. (Doc. 25 at 17; doc. 86). This groundless argument fails.

### B.      Interrogatories

Ms. Stewart next brings a variety of challenges to Hartford's interrogatory responses

(doc. 95-2; 95-3). This court allowed *limited* extra-record discovery in this case, mainly in the

form of interrogatories and requests for production from Ms. Stewart to Hartford. (*See* doc. 61;

83).  Ms. Stewart claims that Hartford failed to adequately answer all of her interrogatories,

made improper objections to those interrogatories, and failed to properly verify the

interrogatories pursuant to Fed. R. Civ. P. 33(b) and 28 U.S.C. § 1726. (Doc. 103 at 13, 19).

These objections fail as well.

As to Ms. Stewart's complaints regarding the adequacy of Hartford's answers and

objections to her interrogatories, this court has *already held* that she failed to properly "discuss"

her concerns with Hartford pursuant to this court's ERISA Order. (Doc. 90 at 2). This court

found that Ms. Stewart engaged only in insufficient "wars of words between opposing counsel."

(Doc. 90 at 2) (quoting doc. 29 at 2–3). Additionally, this court noted that Ms. Stewart sent a

letter to Hartford objecting to its discovery responses on May 12, 2020 and had no further

communication with Hartford regarding those responses until a status conference that this court

held in this case on August 26, 2020. (Doc. 90 at 2).

Accordingly, the court will reject Ms. Stewart's arguments as to the adequacy of

Hartford's discovery responses for the same reason it did in its September 9, 2020 Order (doc.

90): Ms. Stewart waived those arguments by choosing not to timely file a motion to compel and

by failing to comply with this court's ERISA order. *See, e.g.*, 5C Arthur R. Miller, Mary Kay

Kane & A. Benjamin Spencer, *Federal Practice and Procedure* § 1380 n.6 (3d ed. 2020)

(motion to strike discovery-related matter inappropriate; party moving to strike should have

raised those issues through a discovery motion) (citing *Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilation, Inc.*, 94 F.R.D. 300, 304 (N.D. Ill. 1982)).

Ms. Stewart's argument that Hartford failed to properly verify its interrogatory responses likewise lacks merit. Under Fed. R. Civ. P. 33(b)(1)(B) and 33(b)(3), an officer or agent of a corporation must answer interrogatories "under oath." And under 28 U.S.C. § 1746(2), a person making any sworn declaration pursuant to the Federal Rules of Civil Procedure must "*substantially*" follow its form:

> "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."

(Emphasis added). Erik Solem and Andrew Dahl, Hartford's agents for the purpose of responding to Ms. Stewart's interrogatories, verified their interrogatory responses in the following manner:

> I, (Erik Solem/Andrew Dahl), declare under penalty of perjury under 28 U.S.C. § 1746, that the answers to Interrogatories above are true and accurate to the best of my knowledge and belief based upon my personal knowledge and/or upon my review of business records.

(Doc. 95-2 at 10; 95-3 at 7). The court concludes that Hartford properly verified its interrogatory responses. This court has previously rejected an argument similar to Ms. Stewart's. *See Barclay v. First Nat'l Bank of Talladega*, --- F. Supp. 3d ----, ----, 2016 WL 1270519, at *3 (N.D. Ala. 2016) (Bowdre, J.). In *Barclay*, this court pointed out that a statement subject to § 1746 must only "be in '*substantially*'" the statutory form, "not *exactly*" the statutory form. --- F. Supp. 3d at ----, 2016 WL 1270519 at *3 (emphasis in original). And this court held that a declaration is "substantially" in the statutory form if the declarant made it "under the penalty of perjury." *Id*.

Because Messrs. Solem and Dahl verified their interrogatory responses under penalty of perjury, this court finds that those responses meet the requirements of Fed. R. Civ. P. 33(b) and

28 U.S.C. § 1746. Accordingly, it will consider Hartford's interrogatory responses in ruling on the motions for judgment.

### C.    *Remaining Arguments*

As the court alluded to above, the remainder of Ms. Stewart's filing consists of arguments on the merits of this case thinly disguised as "evidentiary objections." Particularly, Ms. Stewart's arguments go to the merits of Hartford's denial of her claim for life-waiver-of-premium (LWOP) benefits. Ms. Stewart argues, for example, that Hartford had no authority to have her examined and to continue its review of her LWOP claim after Hartford approved it on her first appeal (doc. 103 at 2, 6); that Hartford reached an erroneous conclusion as to her ability to work based on the medical evidence in this case (doc. 103 at 4–5, 9); that Hartford did not provide all of her medical records to its independent medical reviewers (doc. 103 at 9–11); and that it set forth an erroneous summary of Ms. Stewart's medical records (doc. 103 at 8). Ms. Stewart also objects—in a conclusory manner and without citations to the record—to Footnote 5 in Hartford's brief (doc. 103 at 8).

All of these arguments go to the merits of this case. Ms. Stewart seems to concede as much: in her "Reply in Support" of her filing, she argues that she would suffer prejudice if she did not respond to Hartford's "interpretations" of the facts and that her filing was a "measured, allowed response to correct the record." (Doc. 107 at 2). While Ms. Stewart's filing was certainly measured, it was not allowed. As the court explained above, it has no obligation to consider Ms. Stewart's "evidentiary objections" at all, and especially when its "evidentiary objections" are really arguments on the merits. The court already provided Ms. Stewart a vehicle through which to make merits arguments: the briefs governed by Appendix II of this court's ERISA Order. The court also allowed the parties' briefs to exceed the usual page limit. (Doc. 94; 100).

Accordingly, the court will **DENY** Ms. Stewart's "Motion to Strike and/or Evidentiary Objections" (doc. 103) in its entirety. But out of an abundance of caution and to *again* give Ms. Stewart the benefit of the doubt—and because Hartford filed a brief in Reply to Ms. Stewart's filing—the court will, where applicable, consider the merits arguments Ms. Stewart raises in her filing.

## II.     Factual and Procedural Background

Having addressed Ms. Stewart's evidentiary objections, the court will now set out the relevant facts of this case. Ms. Stewart claims that Hartford wrongly denied both her claim for long-term disability (LTD) benefits under its Disability Policy and her claim for life-waiver-of-premium (LWOP) benefits under its Life Policy. Because Hartford reviewed these claims largely independently of each other, the court will set out the facts of Hartford's review of Ms. Stewart's LTD and LWOP claims separately and respectively.

As the court explained above, courts in ERISA cases may only consider "the facts known to the administrator at the time the decision was made." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989)). And courts generally limit their review to the administrative record when reviewing an administrator's decision to deny benefits. *Williamson v. Travelport, LP*, 953 F.3d 1278, 1289 (11th Cir. 2020). But because the court allowed limited discovery in this case (*see* docs. 61; 83), the court will consider some evidence outside of the administrative record that the administrator otherwise knew when it made its decision. Accordingly, the court will cite to documents in the administrative record as (AR at ___).[1] It will cite to documents

---

[1] The administrative record in this case is contained in ECF documents 32 and 33.

outside of the administrative in its usual manner: by setting forth the location of the fact in the ECF docket of this case; i.e., as (doc. __ at __).

For the sake of convenience, the court will note here that both the Disability Policy and the Life Policy gave Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms provisions of The Policy." (AR at 19 (Disability Policy); 67 (Life Policy)). Second, under both the disability and life policies, Hartford required that "[a]ll [Proof of Loss] submitted [be] satisfactory to Us." (AR at 17 (Disability Policy); 66 (Life Policy)). And finally, both the disability and life policies listed Burr & Forman LLP as the Employer/Plan Sponsor, Policyholder, and Plan Administrator. (AR at 7, 32 (Disability Policy); 55, 83 (Life Policy)).

### A.        *Long-Term Disability Claim*

Ms. Stewart began working for the law firm of Burr & Forman, LLP (Burr) in 1983 as an associate attorney and became an equity partner in Burr in 1990. (AR at 1111). In 2007, Burr opened a disability insurance policy with the Sun Life Assurance Company of Canada. (AR at 127). After a 2007 diagnosis of Parkinson's disease, Ms. Stewart claimed and began receiving partial LTD benefits for her Parkinson's disease under the Sun Life disability policy in 2009. (AR at 135, 127).

On September 30, 2010, Burr terminated the Sun Life disability policy. (AR at 123). Burr then opened a Disability Policy with Hartford—the policy at issue in this case—effective October 1, 2010. (AR at 7). Ms. Stewart worked her last day for Burr on March 31, 2012; on April 1, 2021, Sun Life began paying her total LTD benefits for her Parkinson's disease under its disability policy. (AR at 127).

Ms. Stewart began the application process for LTD benefits for her Parkinson's disease under Hartford's Disability Policy on April 17, 2012, when her attending physician, Dr. David Standaert, filled out the "Attending Physician's Statement of Disability" as required by the Disability Policy's benefits application. (AR at 651–52). Ms. Stewart then submitted her portion of the Disability Policy's application on June 29, 2012 (AR at 650); on July 26, 2012, Burr submitted its portion of the application. (AR at 642).

Hartford acknowledged initial receipt of Ms. Stewart's LTD claim on August 3, 2012 but noted that it needed more information to evaluate her claim, including additional medical records from Dr. Standaert. (AR at 212). On September 12, 2012, Hartford again informed Ms. Stewart that it had yet to receive her medical records from Dr. Standaert and requested her help in obtaining that information. (AR at 191).

On September 24, 2012, Hartford informed Ms. Stewart of its denial of her LTD claim. In a letter authored by Ability Analyst Vanessa Balogh (AR at 187–90), Hartford noted that it denied her claim based on the following exclusion in the Disability Policy:

> If You are receiving or are eligible for benefits for a Disability under a prior disability plan that:
>
> 1)      was sponsored by Your Employer; and
> 2)      was terminated before the Effective Date of The Policy;
>
> no benefits will be payable for the Disability under The Policy.

(AR at 16). Hartford relied on this exclusion in denying Ms. Stewart's LTD claim because she was "continuing to receive total disability benefits [for her Parkinson's disease] from Sun Life Financial through [her] coverage with the policyholder, Burr & Forman, LLP." (AR at 189).

By facsimile dated November 8, 2012, Ms. Stewart appealed Hartford's denial of her LTD claim. (AR at 753–64). In her appeal, Ms. Stewart advanced contractual interpretation

arguments and concluded that because Sun Life continued to pay her benefits, the policy had not

been "terminated" as required by the exclusion. (AR at 763). She also argued that the exclusion

contained certain undefined terms that did not apply to the Sun Life disability policy and that

because the Hartford Disability Policy specifically defined "Disability," the Sun Life disability

policy could not have been paying her LTD benefits under the Hartford Disability Policy's

definition of "Disability." (AR at 763).

Hartford informed Ms. Stewart by letter dated November 19, 2012 of its decision on

appeal to uphold its denial of her LTD claim. (AR at 180–81). Appeal Specialist Edna Golych

explained the reasoning behind Hartford's decision:

> Information received from Sun Life Financial noted that your benefit effective
> date was 6/30/09. You received partial disability benefits through 3/31/12 and a
> total disability monthly benefit of $21,000 since then. The Sun Life policy issued
> to Burr & Forman, LLP cancelled effective 9/30/10. The Hartford Life and
> Accident Insurance Company policy issued to Burr & Foreman LLP [*sic*] became
> effective 10/1/10. As you were and are receiving LTD benefits under the prior
> carrier, Sun Life Financial, you are not eligible for LTD benefits under The
> Hartford policy.

(AR at 181). Hartford then suggested that Ms. Stewart seek a refund of her LTD premiums and

informed her of her suit rights under ERISA. (AR at 181).

### B.    *Life Waiver of Premium Claim*

The Hartford Life Policy includes life-waiver-of-premium (LWOP) benefits, under which

Hartford waives the life insurance premiums of "Disabled" insureds. (AR at 60). For purposes of

the LWOP provision, the Hartford Life Policy defines "Disabled" as follows:

12

**Disabled:** *What does Disabled mean?*

Disabled means You are prevented by injury or sickness from doing any work for which You are qualified by:

    1) Education;
    2) Training; or
    3) Experience.

***

(AR at 60). Because the court must necessarily engage in a fact-intensive analysis of the facts underlying Hartford's decision to deny Ms. Stewart's LWOP claim, the court will recount those facts at some length.

Ms. Stewart began the application process for LWOP benefits on July 2, 2012 when she submitted her portion of the LWOP application. (AR at 1613–15). She listed Parkinson's disease as the medical condition underlying her claim. She noted that she stopped working because of the "debilitating and progressive" nature of her symptoms, which had progressed to the "point [that she could] no longer practice law." She stated that her condition had altered the way she performed her job, namely that she "became less effective and efficient—[she] had to make adjustments and took reductions in compensation." Finally, she remarked that the mental and physical effects of her Parkinson's prevented her from performing "mental analysis, writing, researching, [and] advising clients on important matters." (AR at 1614).

Burr submitted its portion of Ms. Stewart's LWOP application by letter dated July 30, 2012; on August 1, 2012, Hartford informed Ms. Stewart of its initial receipt of her application. (AR at 258; 1111). By form letter dated August 20, 2012, Hartford requested additional information from Dr. Standaert regarding Ms. Stewart's Parkinson's disease in relation to her LTD claim. Dr. David Standaert, MD, PhD, treated Ms. Stewart and served as her attending physician during the pendency of her claims for both LTD and LWOP benefits. Dr. Standaert has

13

a board certification in neurology and specializes in Parkinson's disease and movement disorders, an area in which he has practiced for over 20 years. (AR at 1023). Dr. Standaert responded to Hartford's request by letter dated August 23, 2012. In that letter, he noted that Ms. Stewart could sit two hours per day; stand half an hour per day; and walk one hour per day. He also opined that Ms. Stewart could participate in "vocation rehabilitation services," which the form defined as "worksite accommodations, identifying alternative work and or retraining assistance." (AR at 813).

In its initial review of her LWOP claim, Hartford also relied on the April 17, 2012 Attending Physician's Statement Dr. Standaert submitted with Ms. Stewart's LTD application. (AR at 255). In the April 17, 2012 Attending Physician's Statement, Dr. Standaert noted that Ms. Stewart exhibited slowness, tremor, fatigue, rigidity, and bradykinesia. (AR at 651). He opined that she had the ability to lift or carry 1 to 10 pounds "occasionally," which the Statement defined as 1-33% of the day. Additionally, he concluded that she could sit two hours at a time, stand for half an hour at a time, and walk for half an hour at time. Finally, he determined that she could never bend at the waist, never kneel or crouch, could occasionally drive, could occasionally reach at and below waist or desk level, and could never finger or handle. (AR at 652). And as to the duration of Ms. Stewart's Parkinson's, Dr. Standaert finally noted the "permanent" and "incurable" nature of the disease and pointed out that it would "worsen with time." (AR at 652).

By letter dated October 1, 2012, Ability Analyst Vanessa Balogh informed Ms. Stewart that Hartford had denied her LWOP claim. (AR at 252–57). Although Hartford concluded that Ms. Stewart did not meet the LWOP provision's definition of "Disability," Ms. Balogh misquoted that definition. She stated that the definition required Ms. Stewart to be "prevented by

injury or sickness from doing any work for which You are *or could become* qualified by education, training or experience." (AR at 256) (emphasis added). The words "or could become" do not appear in the actual definition of "Disabled" in the LWOP provision. (*See* AR at 60). In any event, Ms. Balogh explained that Hartford relied on Dr. Standaert's statements of April 17, 2012 and August 23, 2012 in denying her claim. Based on Ms. Stewart's abilities as communicated by Dr. Standaert's statements, Hartford concluded that Ms. Stewart was not "Disabled" and denied her LWOP claim. Hartford reasoned that although Ms. Stewart's condition may have prevented her from working as an equity partner, it did not prevent her "from performing any work." (AR at 256).

Ms. Stewart appealed Hartford's denial by letter dated October 10, 2012. (AR at 1083–85). In her letter, Ms. Stewart pointed out that Ms. Balogh misquoted the definition of "Disabled" and disagreed with Hartford's conclusion that the LWOP provision's definition of "Disabled" required her to show that she was incapable of performing *any work*—as opposed to only the work of an equity partner. (AR at 1084).

Hartford received more of Ms. Stewart's medical records from Dr. Standaert on October 5, 2012; accordingly, it did not consider those records before it issued its October 1, 2012 denial. (AR at 786–96). Those records consist of notes entered by Dr. Standaert regarding his visits with and treatment of Ms. Stewart between July 23, 2010 and March 30, 2012. On Ms. Stewart's July 23, 2010 visit, Dr. Standaert noted that Ms. Stewart reported increased tremor, slowness and stiffness. He opined that "although the magnitude of [worsening of symptoms] is modest, they are concerning for worsening disability." (AR at 795). On the February 11, 2011 visit, Dr. Standaert noted "moderate to marked slowing of finger movements on the left" and increased stiffness and rigidity in Ms. Stewart's left leg. (AR at 793). Dr. Standaert did not note any

significant changes in Ms. Stewart's condition on her September 23, 2011 visit, but noted that she reported fatigue and difficulties with concentration at work. (AR at 791). On Ms. Stewart's January 20, 2012 visit, Dr. Standaert noted worsening of her symptoms, both physical and cognitive. Ms. Stewart reported to him that she had "increased difficulty with concentration, particularly when trying to perform multiple tasks[, which had] reached a point of causing serious problems at work with difficulty completing tasks in a timely fashion." (AR at 789). Importantly, he concluded that "the severity of her symptoms at this point make it impossible for her to continue in her occupation as an attorney, and I concur with the decision to seek disability and retirement at this point." (AR at 790). Finally, on her March 30, 2012 visit, Dr. Standaert noted that Ms. Stewart reported new tremor in her left upper extremity at rest but no recent cognitive decline. Ms. Stewart also reported to Dr. Standaert that she had the ability to "[perform] all activities of daily living independently and [to drive] safely." (AR at 787).

Hartford assigned Ms. Stewart's appeal to Appeal Specialist Edna Golych. (AR at 171). Ms. Golych ordered an independent physician review of Ms. Stewart's claim and medical records. (AR at 169). Dr. Uzma Sharif, MD, board certified in neurology, reviewed Ms. Stewart's medical records. (AR at 745). Dr. Sharif provided the review through the University Disability Consortium, a third-party independent medical review vendor. Dr. Sharif review Dr. Standaert's Attending Physician's Statements of April 17, 2012 and August 23, 2012 and his visit notes from July 23, 2010 to March 30, 2012. (AR at 745). Dr. Sharif reported that she spoke with Dr. Standaert on November 27, 2012 and that Ms. Stewart had reported to him worsening of both her motor and cognitive symptoms. Dr. Sharif concluded that Ms. Stewart should have the following physical limitations from March 31, 2012: sitting 4–6 hours per day, walking and standing half an hour to an hour per day, and not carrying over 10 pounds. She also suggested

that Ms. Stewart should limit her fine motor skills due to impaired motor coordination and limit

her driving due to slowed cognitive processing concerns. She noted that "[f]ormal cognitive

testing could…help in determining the driving limitations" but that because "Parkinson's is a

chronic irreversible disease, she will most likely continue to be more limited in most physical

and cognitive activities depending on her overall rate of decline." As to Ms. Stewart's ability to

work, Dr. Sharif concluded that Ms. Stewart could "work somewhere where she does not have

the stress of deadlines but has open ended tasks that she can do at her comfort level." But Dr.

Sharif pointed out that Ms. Stewart had not had any formal neuropsychological testing done. (AR

at 748).

      After receiving Dr. Sharif's report, Ms. Golych concluded that "[b]ased on the

progression of [Ms. Stewart's] disease and her present limitations it is reasonable that she would

not be able to perform even at a part-time level on a consistent basis….The appeal decision is to

reverse the denial." (AR at 168). On December 12, 2012, Anna K. Davis entered an "Appeal

Specialist Recommendation" in Ms. Stewart's claim file. (AR at 165). Ms. Davis noted that

although Dr. Sharif's report showed that Ms. Stewart had cognitive processing issues, Dr.

Sharif's report also stated that Ms. Stewart had not received formal neuropsychological testing to

determine the extent of those issues. Ms. Davis pointed out that Hartford had not ordered

neuropsychological testing during the appeal because such testing would not allow Hartford to

determine Ms. Stewart's cognitive functionality from her last day of work through the LWOP

waiting period. Accordingly, Ms. Davis noted that "functionality is not clear, but appears to be

limited…[f]urther clarification of [Ms. Stewart's] current functionality appears likely to be

needed." (AR at 165). On December 21, 2012, Examiner Monique J. Marr directed that Hartford

approve Ms. Stewart's claim, but—consistent with the recommendation of Ms. Davis—noted

that the Life Policy had the "right of exam" and accordingly instructed that Hartford have Ms.

Stewart sit for neuropsychological testing. (AR at 165).

Hartford informed Ms. Stewart of its decision to reverse its denial of LWOP benefits by

letter dated December 5, 2012 and informed her that her claim file had been returned to the

"Sacramento Disability Claim Office for further handling." (AR at 246). In a second letter dated

December 28, 2012, Hartford informed Ms. Stewart that it would waive her premiums effective

December 31, 2012 and set out its position regarding her LWOP benefits going forward. (AR at

244–45). Specifically, it informed her that

> Periodically we will be requesting updated medical information from you to
> verify your continued disability, and consequently your continued eligibility for
> the Waiver of Premium benefit. We will be reviewing your claim to clarify your
> cognitive limitations and will notify you of any additional information we need to
> complete that review.

(AR at 245). Ms. Balogh, one of Hartford's Ability Analysts, entered Hartford's approval of Ms.

Stewart's claim in her claim file on December 28, 2012. Ms. Balogh noted that based on Dr.

Sharif's report, Hartford concluded that Ms. Stewart had part-time "work ability *physically*,

however [Ms. Stewart] has had slowed cognitive processing and [due to] the progression of her

disease and present limitations, it is reasonable that [Ms. Stewart] is not able to perform work"

on a part-time basis consistently. (AR at 163–64) (emphasis added).

On January 3, 2013, Ms. Balogh formally referred Ms. Stewart's claim for

neuropsychological testing. (AR at 162–63). Hartford obtained the testing through PsyBar, a

third-party testing vendor, and requested a neuropsychologist to test Ms. Stewart located within a

60-minute drive of Birmingham, Alabama. (AR at 120, 160–63). By letter dated January 30,

2013, Hartford confirmed Ms. Stewart's appointment for neuropsychological testing with Dr.

Nick DeFilippis, Ph.D., a board-certified neuropsychologist. The letter informed Ms. Stewart

that Dr. DeFilippis would perform the testing in the meeting room of the Redmont Hotel in

Birmingham. The letter also set out Hartford's authority to perform the testing under the Life

Policy:

> **When Premiums are Waived:** *When will premiums be waived?*
>
> If We approve Waiver of Premium, We will notify You of the date We will begin
> to waive premium. In any case, We will not waive premiums for the first 9
> month(s) You are Disabled. We have the right to:
>
>> 1) require Proof of Loss that You are Disabled; and
>> 2) have You examined at reasonable intervals during the first 2 years after
>> receiving initial Proof of Loss, but not more than once a year after that.
>
> If You fail to submit any required Proof of Loss or refuse to be examined as
> required by Us, the Waiver of Premium ceases.

(AR at 240).

Dr. DeFilippis performed Ms. Stewart's neuropsychological testing on March 8, 2013.

His report to Hartford consisted of two documents: (1) a Behavioral Functional Evaluation Form

(BFE), which stated that it was "[t]o be completed by the Attending Physician," but which Dr.

DeFilippis—*not* Dr. Standaert, Ms. Stewart's attending physician—completed and signed; and

(2) a Neuropsychological Independent Evaluation (IME). (AR at 1037–52). The BFE form

contained a list of brief conclusions Dr. DeFilippis drew based on his testing of Ms. Stewart,

while the IME contained a longer description of the testing and his conclusions.

In the BFE, Dr. DeFilippis concluded that Ms. Stewart had full cognitive ability in all

areas except two: (1) her ability to "[influence] people in their opinions, attitudes, and

judgments," an area in which Dr. DeFilippis concluded that Ms. Stewart had "moderate ability;"

or, 84–67% of the day; and (2) her ability to "[p]erform effectively under stress," an area in

which Dr. DeFilippis also concluded that Ms. Stewart retained "moderate ability." (AR at 1052).

In his IME, Dr. DeFilippis first noted that he had reviewed Dr. Standaert's visit notes from July

23, 2010 to March 20, 2012 and the August 20, 2012 Attending Physician's Statement prepared by Dr. Standaert for Hartford. (AR at 1037–38). Dr. DeFilippis then recounted the answers Ms. Stewart gave in her interview with him. Importantly, Dr. DeFilippis asked Ms. Stewart about her typical daily activities. Ms. Stewart reported to Dr. DeFilippis that she used a computer; served on the advisory board of a charitable organization in Birmingham; served on a committee of the Alabama State Bar that met twice yearly; served on a committee of the Birmingham Bar Association that met once a month; served on Burr & Forman's charitable contribution committee, which met once every two months; prepared meals; handled some financial matters; shopped and spent time with friends; and travelled. She also reported that she enjoyed craft work but noted that such work had become more difficult because of her condition. Finally, she reported that she could drive with medication and could take care of chores around the house and most of her personal dressing and grooming; but noted that she had some trouble washing her hair, fastening buttons, shaving and putting on earrings. (AR at 1040–41).

Dr. DeFilippis also asked Ms. Stewart to describe her "work issues." She answered that she feared making errors; that she took a long time to complete work; that she felt that she would not be able to meet deadlines as an attorney; that she sometimes could not function physically at all because of her symptoms and that stress increased her symptoms; that she felt that she could be at work 40 hours per week but would not be productive. She reported that she did not have any difficulty relating to people; that she did not think she could work as an attorney because she feared making a mistake and because she needed people to check her work; that she had trouble typing; and that her tremors led to a lack of confidence. (AR at 1041).

Finally, as to the symptoms of her Parkinson's, Ms. Stewart reported to Dr. DeFilippis that she suffered tremors on her left side that she controlled with medications; that she suffered

from intermittent muscle pains; that she noticed a softening in her voice; that she had become slower in getting things done; and that she suffered from a scattered ability to focus. She reported that she could write legibly but small; and that it took her longer to write. (AR at 1039).

Dr. DeFilippis then performed a battery of neuropsychological tests on Ms. Stewart, including an intelligence test, a memory test, a reading comprehension test, and ability tests. Dr. DeFilippis reached the following conclusions regarding Ms. Stewart: he concluded that she "put forth good effort during the cognitive testing and showed no evidence of a tendency to exaggerate her problems." He noted that she showed evidence "of some mild and inconsistently displayed difficulty in the areas of focusing and processing speed." (AR at 1048).   He reported that she had "intact problem-solving abilities" and opined that she "should be able to multitask and cope with difficult problem-solving tasks," but noted that she reported that she felt "somewhat disorganized" in completing such tasks. He reported that she did well on memory testing but found "some signs of a mild attention issue … that could affect memory on occasion." He narrated that Ms. Stewart's speech was "a bit slower than expected, but still in the average range in terms of fluency;" he also found that Ms. Stewart had a "mild visual motor impairment" and noted that she was "quite slowed motorically, particularly with her left hand" and that she walked slowly and reported a gait disturbance. Finally, he reported that she read well and fluently; he also reported that she had a mild level of depression regarding her Parkinson's disease; that stress exacerbated her condition; and that she strove "to avoid errors in settings where she is being evaluated by others." (AR at 1049).

Dr. DeFilippis gave the following report to Hartford regarding Ms. Stewart's ability to work: he opined that she would have trouble typing; would be slow in writing and that she would take twice as long to write and type; that her "mild and inconsistently displayed attention issues"

would cause her to be "somewhat forgetful at times," so that she would have to take notes in these situations, leading to increased slowness; that she would be less confident in presentations to others due to stress-induced tremors; and that he did not find "clear evidence that she would be disorganized in problem solving, but [that] she likely would take longer to complete work that requires focusing on several areas of information at the same time." He estimated that it would take Ms. Stewart "between twenty-five percent and fifty percent more time to complete such tasks." Finally, he reached the ultimate conclusion that Ms. Stewart "likely has a belief that she is less capable from a cognitive standpoint than she actually is," but that he found problems "related to mild processing speed issues and motor coordination…along with mild attention issues that are affecting her capabilities." (AR at 1050).

 Between Hartford's approval of Ms. Stewart's LWOP claim in December 2012 and her tests with Dr. DeFilippis in March 2013, Hartford assigned her LWOP claim to Examiner Ian Hardy of Atlanta. (AR at 158). The parties differ regarding the significance of Hartford's assignment of Mr. Hardy to Ms. Stewart's claim. According to Hartford, it undertook a claims administration reorganization between December 2012 and March 2013 under which it assigned all LWOP claims to a dedicated LWOP team in Georgia. Mr. Hardy took part in this routine reorganization and Hartford assigned him to Ms. Stewart's LWOP claim. (Doc. 95-3 at 4). But Ms. Stewart claims—based on reports Mr. Hardy made in his performance reviews—that Hartford directed Mr. Hardy to deny LWOP claims regardless of the merit of those claims. (Doc. 67-4 at 35).

In any event, Mr. Hardy reviewed Dr. DeFilippis's BFE and IME form and recommended that Hartford terminate Ms. Stewart's LWOP claim. (AR at 158–59). Mr. Hardy concluded, based on Dr. DeFilippis's reports, that Ms. Stewart retained "full to moderate functionality to

perform work" despite "some deficits in fine motor coordination and in attention." (AR at 159).

Manager Joe Simeone of Sacramento agreed with Mr. Hardy's termination recommendation.

(AR at 159). Mr. Simeone clarified that Hartford based its previous award of LWOP benefits on

Dr. Sharif's report, which "noted cognitive processing issues." However, Mr. Simeone pointed

out that Ms. Stewart had not had any formal neuropsychological testing done. Accordingly, the

results of Dr. DeFilippis's testing clarified her cognitive limitations and demonstrated that she

"ha[d] full to moderate ability to perform varied activities (including performing repetitive or

short cycled work, performing effectively under stress, and being consistent and reliable)." (AR

at 159).

In an April 10, 2013 letter authored by Mr. Hardy, Hartford informed Ms. Stewart of its

decision to terminate her LWOP benefits. (AR at 235–39). Mr. Hardy explained that based on

the conclusions Dr. DeFilippis drew from his testing of Ms. Stewart, Hartford had concluded that

Ms. Stewart "[had] the functionality to perform work;" accordingly, it determined that she did

not meet the Life Policy's definition of "disabled." (AR at 238).

Ms. Stewart appealed Hartford's termination of her LWOP benefits in a detailed letter

dated October 4, 2013. (AR at 972–1019). Ms. Stewart—through counsel—made a variety of

arguments against Hartford's decision to terminate her LWOP benefits, but only several of those

arguments have relevance to this action. Relevant here, Ms. Stewart argued (1) that Hartford did

not have the authority to order Dr. DeFilippis's neuropsychological testing or to terminate her

LWOP based on the results of that testing; (2) similarly, that Hartford had no authority to

terminate her LWOP benefits after the decision of Appeal Analyst Edna Golych awarding her

benefits; (3) that Hartford improperly applied the "any occupation" standard to the definition of

"disability" in the Life Policy; and (4) that Dr. DeFilippis improperly filled out the BFE form,

which stated that it was to be completed by the examinee's attending physician, because Dr. DeFilippis was not Ms. Stewart's attending physician. (AR at 972–73).

In response to Ms. Stewart's appeal, Appeal Specialist Marsha Macko ordered a "co-morbid medical review" of Ms. Stewart's claim file by both a neurologist and a neuropsychologist. (AR at 154). Ms. Macko requested that the reviewing neurologist contact Dr. Standaert. Ms. Macko noted that she would include all medical evidence in Ms. Stewart's LTD and LWOP claim files for the reviewers, with the exception of three documents: (1) she would not include Dr. DeFilippis's BFE form because of Ms. Stewart's complaint that Dr. DeFilippis was not her attending physician, and the form was intended for completion by her attending physician; (2) she would not include Dr. Uzma Sharif's report (completed after Ms. Stewart's first appeal) because Dr. Sharif did not examine Ms. Stewart; and (3) she would not include Ms. Stewart's job description, because whether Ms. Stewart could perform the duties of an equity partner attorney bore no relevance to whether she could perform "any work" as contemplated by the Life Policy's definition of "disabled." (AR at 154).

The reviewing neuropsychologist and neurologist submitted their reports to Hartford on October 31, 2013. (AR at 925; 931). The reviewing neuropsychologist, Dr. Christopher Contardo, Ph.D., board certified in neuropsychology, reviewed Dr. Standaert's visit notes and the IME prepared by Dr. DeFilippis. (AR at 923). Dr. Contardo also discussed the case with the reviewing neurologist, Dr. Andrew Gordon, MD., board certified in psychiatry and neurology. (AR at 923; 931). Dr. Contardo concluded, based on his review of Ms. Stewart's case, that Ms. Stewart retained the cognitive capacity to perform "full time work that does not require higher-level, complex organization and cognitive skills" and deferred to his co-reviewer, Dr. Gordon, for an analysis of Ms. Stewart's physical capabilities. (AR at 924).

Dr. Gordon, the reviewing neurologist, considered Dr. Standaert's visit notes in support of his opinion. (AR at 928). Although Dr. Gordon could not establish telephonic contact with Dr. Standaert, Dr. Gordon faxed Dr. Standaert a list of questions, to which Dr. Standaert faxed a response to Dr. Gordon. (AR at 929). In his fax to Dr. Gordon, Dr. Standaert described his treatment of Ms. Stewart and the progression of her Parkinson's disease; he informed Dr. Gordon that Ms. Stewart's "most troublesome symptoms exemplify the 'non-motor' symptoms of the disease that are increasing[ly] recognized as a major source of disability and reduced quality of life….fatigue was an early and dominant feature of her disorder…neither the cognitive nor the motor symptoms are optimally managed." (AR at 1024). As to Ms. Stewart's ability to work, Dr. Standaert provided the following opinion to Dr. Gordon:

> With respect of the specific issue of disability, I think it is important to recognize that her career has been as an attorney practicing courtroom law, an environment very intolerant of fatigue or mental or physical slowness. Despite my best efforts over six years, I do not think she is capable of continuing her former occupation. Although she has been a leader in the field in the past, I would not feel comfortable having her represent me in a critical legal matter in her present state; the probability of an error from fatigue or mental slowness in this setting is simply too high.
>
> Legal practice aside, I think she unquestionably qualifies as having disability under the more ordinary terms of the ADA. In addition to the cognitive symptoms, she has impaired balance with the risk of falling, impaired use of her hands with inability to write, and rigidity, all of which make self-care difficult or impossible much of the time.

(AR at 1024).

Based on his review of the records he received from Dr. Standaert, Dr. Gordon concluded that Ms. Stewart demonstrated "some difficulty with gait, strength in the left upper extremity and mild cognitive difficulties." (AR at 929). As to Ms. Stewart's ability to work, Dr. Gordon opined that Ms. Stewart retained the physical capability to perform "full time sedentary work" within

certain restrictions, namely: (1) Ms. Stewart could not work from unprotected heights; (2) she could not lift or carry more than 40 pounds occasionally or more than 25 pounds frequently; and (3) she could not walk or stand for more than 30 minutes per hour or more than a combined total of two hours per day. Additionally, Dr. Gordon recommended that Ms. Stewart "should be permitted two 15-minute breaks given the difficulties she may encounter during the work day due to" the impairments caused by her Parkinson's disease. (AR at 930).

Based on the reports of Drs. Contardo and Gordon, Ms. Macko recommended that Hartford uphold Mr. Hardy's termination of Ms. Stewart's LWOP benefits. (AR at 144–46). Ms. Macko informed Ms. Stewart of Hartford's final decision to deny her LWOP benefits by letter dated November 21, 2013. (AR at 223–29). Ms. Macko first pointed out that although Hartford awarded Ms. Stewart LWOP benefits based on Dr. Sharif's independent review, Dr. Sharif actually *did* conclude that Ms. Stewart had the physical ability to work somewhere where "she did not have the stress of deadlines; where she could perform open-ended tasks at her own comfort level and where she did not have to perform fine motor manipulation." (AR at 225). Accordingly, Hartford concluded that Dr. Sharif's report supported a finding that Ms. Stewart was not "Disabled" for purposes of the LWOP provision.

Next, Ms. Macko responded to Ms. Stewart's concerns regarding Dr. DeFilippis's BFE. Ms. Macko acknowledged that Dr. DeFilippis erroneously filled out the form because he was not Ms. Stewart's attending physician; accordingly, Hartford did not take the contents of that form into consideration on appeal. (AR at 226–27). However, Hartford did consider the results of Dr. DeFilippis's tests, which led it to the conclusion that Ms. Stewart retained the cognitive ability to perform some work. (AR at 227). In particular, Ms. Macko noted that "*the most compelling information* with regard[] to Ms. Stewart's ability to perform any work (including part time work

26

activities) is [her] self-reported functionality as was given to Dr. DeFilippis on March 13, 2013." (AR at 227) (emphasis added). Ms. Macko pointed out that Ms. Stewart reported to Dr. DeFilippis that she could serve on the boards of charitable organizations, use a computer, drive a motor vehicle, handle financial matters, write legibly but slowly, travel, perform chores around the house, prepare meals, and engage in other activities of daily living. (AR at 227).

Hartford also relied on the reports of Drs. Contardo and Gordon in reaching its conclusion that Ms. Stewart did not meet the Life Policy's definition of "Disabled." (AR at 227–28). Additionally—and importantly—Ms. Macko pointed out that Hartford did not dispute that Ms. Stewart could no longer "perform the essential duties of an attorney." But, Ms. Macko noted, "the definition of Disabled contained in the Group Life Waiver of Premium policy is specific to any occupation and is not limited to the duties of an Attorney." (AR at 229). Ms. Macko further pointed out that Hartford interpreted the term "any work" in the Life Policy's definition of "Disabled" to mean "work that can be performed on a full time or part time basis, for remuneration or on a volunteer basis. Any work is not limited to the essential duties of an Attorney nor is it limited to a position with Burr & Forman LLP only." (AR at 226).

Finally, the court will note here that the Social Security Administration found that Ms. Stewart became "disabled" for its purposes on April 1, 2012. (AR at 560). Ms. Macko noted that the Life Policy's definition of "Disabled" is more stringent than that of the SSA. (AR at 229). In any event, Ms. Stewart does not argue in this case that Hartford improperly ignored the findings of the SSA, which has its own definition of "disabled."

In sum, Hartford concluded that Ms. Stewart retained the ability to "perform at least part time, modified, sedentary level work activities which do not require higher level cognitive function." (AR at 229). And, Hartford pointed out, because Ms. Stewart "[was] able to perform

27

any work," it did not consider her "to be Disabled under the Group Life Waiver of Premium policy." (AR at 229). Hartford then informed Ms. Stewart that its decision was final and binding and that she had exhausted all of her administrative remedies. (AR at 229).

### C.   *Procedural History*

After Hartford's final denial of her claims for LTD and LWOP benefits, Ms. Stewart filed this ERISA action on August 22, 2017. (Doc. 1). She brought causes of action for LTD and LWOP benefits owed and for injunctive relief under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) (Counts One and Three); and for breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Count Two). (Doc. 1 at 77–80). This court then dismissed Ms. Stewart's claim for breach of fiduciary duty (Count Two), leaving only her claim for benefits owed (Count One) and for injunctive relief (Count Three) under ERISA § 502(a)(1)(B). (Docs. 38; 39). And as the court pointed out above, it allowed Ms. Stewart to engage in limited extra-record discovery as to the role of Ian Hardy in denying Ms. Stewart's claim and as to Hartford's authority to have Ms. Stewart tested. (Doc. 61; 83). Hartford (doc. 95) and Ms. Stewart (doc. 96) have filed cross-motions for judgment, which are now ripe for the court's review.

## III.   Standard of Review

In her motion for judgment, Ms. Stewart raises two primary issues: (1) whether Hartford gave her a full and fair administrative review and properly followed its claims procedures as required by ERISA; and (2) whether Hartford properly denied her claims for LTD and LWOP benefits. The court will explain the standards applicable to these arguments in order.

### A.      Full and Fair Administrative Review

ERISA requires claims administrators—like Hartford here—to provide claimants with a "full and fair" administrative review. 29 U.S.C. § 1133(2). In the words of the Eleventh Circuit, "an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process." *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 676 (11th Cir. 2014).

Two independent but related corollaries flow from the requirement that a claims administrator provide a claimant with a full and fair administrative review of her claim. First, the claims administrator must compile a "complete and accurate" administrative record. *Williamson v. Travelport, LP*, 953 F.3d 1278, 1290 (11th Cir. 2020). And the Eleventh Circuit has cautioned that because a "complete record is a 'predicate' to [a court's] substantive review of a claim," district courts should not consider dispositive motions regarding the ultimate benefits decision until the administrator properly certifies the record or until "the parties stipulate to a complete record." *Williamson*, 953 F.3d at 1290 (quoting *Melech*, 739 F.3d at 673). In other words, the "claimant must have a reasonable opportunity to contest whether that record is complete." *Williamson*, 953 F.3d at 1289. If a court determines that the administrator has not compiled a complete record, then the court should remand to the administrator and should not rule on dispositive motions. *Melech*, 739 F.3d at 676 (citing *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1330 (11th Cir. 2001)).

And second, the administrator must follow reasonable claims procedures, as set out in 29 C.F.R. § 2560.503–1, in making its benefits determination. *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1316 (11th Cir. 2000); *Otero v. Unum Life Ins. Co. of Am.*, 226 F. Supp. 3d 1242, 1260 (N.D. Ala. 2017). These regulations impose "minimum requirements for benefit claims

procedures." *Otero*, 226 F. Supp. 3d at 1260. Under 29 C.F.R. § 2560.503–1(*l*), a court will deem a claimant's administrative remedies exhausted if the administrator fails "to establish or follow claims procedures consistent with the requirements of" the regulations. This court has held that when a claims administrator that has discretion to interpret the terms of the plan and to make benefits determinations under the plan fails to issue a decision within the time period established by ERISA regulations, a reviewing federal court will apply a *de novo* standard of review to the administrator's ultimate benefits determination. *Otero*, 226 F. Supp. 3d at 1265–66. And other courts have held that a plan administrator's failure to comply with *any* of the regulations set forth in 29 C.F.R. § 2560.503–1 requires a federal court reviewing the benefits determination to apply a *de novo* standard of review to that determination. *McConnell v. Am. Gen. Life Ins. Co.*, 434 F. Supp. 3d 1285, 1289 (S.D. Ala. 2020); *Halo v. Yale Health Plan*, 819 F.3d 42, 50–58 (2d Cir. 2016).

Courts review the administrator's compliance with the "full and fair review" requirement *de novo*, as such compliance presents a question of law to which the court owes the administrator no deference. *Boysen v. Ill. Tool Works Inc. Separation Pay Plan*, 767 F. App'x 799, 806 (11th Cir. 2019) (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199–1200 (11th Cir. 2010)).

### B.      Benefits Determination

ERISA itself does not establish a judicial standard of review for benefits determinations. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). Accordingly, the Eleventh Circuit has developed—based on the decision of the Supreme Court in *Firestone*—a six-step framework under which courts review an administrator's benefits determination. *Blankenship*, 644 F.3d at 1354. The framework goes like this:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if [the administrator] operated under a conflict of interest.

(5) If [] no conflict, then end the inquiry and affirm the decision.

(6) If [] a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.2d 1189, 1195 (11th Cir. 2010) and modifying review framework to reflect the United States Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

In this case, both the Disability Policy and the Life Policy vested Hartford with discretion in making benefits-eligibility determinations. (AR at 19 (Disability Policy); 67 (Life Policy)). Accordingly, as long as Hartford—the claims administrator—properly exercised that discretion in compliance with ERISA, the court must review its denial decisions deferentially regardless of whether the court finds those decisions *de novo* wrong. And because Hartford operated under a conflict of interest in denying Ms. Stewart's claim for LWOP benefits, the court must take Hartford's conflict into account as a factor when determining whether Hartford acted arbitrarily and capriciously in denying Ms. Stewart's LWOP claim. *Blankenship*, 644 F.3d at 1355.

## IV.      Analysis

Ms. Stewart challenges both Hartford's compliance with ERISA's "full and fair review" requirement and its ultimate decision to deny her LTD and LWOP benefits. The court will address Ms. Stewart's arguments in turn.

### A.      *Full and Fair Review*

Ms. Stewart argues that Hartford denied her a full and fair administrative review of both her LTD and LWOP claims. Regarding her LTD claim, Ms. Stewart presents a laundry list of ERISA regulations that she claims Hartford violated in reviewing her claim. And as to her LWOP claim, Ms. Stewart argues that Hartford did not compile a complete administrative record and lacked procedural authority to order her neuropsychological testing and to overturn the decision of Ms. Golych awarding her benefits. Because of these failures, Ms. Stewart argues, the court should not review Hartford's ultimate benefits decisions deferentially. (*See* doc. 102 at 19). The court will address the LTD and LWOP claims in turn.

### i.      <u>LTD Claim</u>

Ms. Stewart submits a long list of ERISA regulations that she claims Hartford violated, thereby infringing her right to an administrative full and fair review of her claim for LTD benefits. At the outset, though, the court notes that Ms. Stewart provided this list of regulations for the first time in her reply brief on her motion for judgment and did not cite them in her initial brief. (*See* doc. 97; doc. 102 at 21–22). As this court has repeatedly held, "new arguments are improper if presented for the first time in a reply brief." *Dates v. Frank Norton, LLC*, 190 F. Supp. 3d 1037, 1040 (N.D. Ala. 2016) (citing *Herring v. Sec'y, Dept. of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005)). This court accordingly has no obligation to consider Ms. Stewart's arguments regarding Hartford's compliance with ERISA regulations in denying her LTD claim.

But because Ms. Stewart's arguments also fail on the merits, the court will explain those reasons anyway for completeness.

Ms. Stewart first argues that Hartford's Ability Analyst untimely rendered a decision to deny her LTD benefits under 29 C.F.R. § 2560.503–1(f)(3), which requires the administrator to render a decision within 45 days of "receipt of the claim by the plan." Hartford acknowledged initial receipt of Ms. Stewart's claim on July 20, 2012. (AR at 139). Hartford—through Ms. Balogh—denied Ms. Stewart's LTD claim on September 24, 2012, 59 days later. (AR at 187). But in its letter of August 3, Hartford informed Ms. Stewart that it needed more information to complete Ms. Stewart's claim, including medical records from Dr. Standaert. (AR at 212). And on September 12, 2012, Hartford informed Ms. Stewart that it still needed information from Sun Life Financial regarding Ms. Stewart's benefits under its policy and additional information from Dr. Standaert. (AR at 191).

Under 29 C.F.R. § 2560.503–1(f)(4), the 45-day decision period is tolled if the administrator cannot make a benefits-eligibility decision "due to a claimant's failure to submit information necessary to decide a claim." As explained above, Hartford notified Ms. Stewart *twice* that it needed additional information from her to decide her claim: once on August 3, 2012 (AR at 212) and again on September 12, 2012. (AR at 191). In both letters, Hartford explicitly requested Ms. Stewart's assistance in obtaining the necessary information in order "to avoid any delays in processing your claim for benefits." (AR at 191; 212). Accordingly, the court finds that Hartford properly tolled the 45-day time limit under 29 C.F.R. § 2560–503.1(f)(4) until at least September 12, 2012. Hartford then timely issued a benefits determination 12 days later, on September 24, 2012. So Ms. Stewart's timeliness argument fails.

Ms. Stewart next argues that both the Ability Analyst Vanessa Balogh on initial review and the Appeal Specialist Edna Golych failed to state a specific reason for their denials as required by 29 C.F.R. § 2560.503–1(g)(i). But both Ms. Golych and Ms. Balogh *did* provide the specific reason for their denials: that Ms. Stewart was receiving benefits for the claimed disability—her Parkinson's disease—from a prior disability plan that was sponsored by her employer. (AR at 180–81; 187–90). That Ms. Stewart disagreed with the specific reason for the denial of her claim does not mean that Ms. Balogh and Ms. Golych did not provide a specific reason. Additionally, this Circuit has held that notifications of adverse benefits determinations must only "substantially comply" with the ERISA regulations. *Blair v. Metro. Life Ins. Co.*, 569 F. App'x 827, 831 (11th Cir. 2014) (citing *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1317–18 (11th Cir. 2000); *Counts v. Gen. Life Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997)). A letter "substantially complies" with ERISA regulation where "the letter taken as a whole supplied the plaintiff with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Blair*, 569 F. App'x at 831 (quoting *Counts*, 111 F.3d at 108) (internal alterations omitted). And both Ms. Golych and Ms. Balogh clearly set forth Hartford's position and the exclusion upon which it relied in denying her LTD benefits.

Ms. Stewart argues that Ability Analyst Vanessa Balogh failed to "reveal the time limits applicable to Hartford in the procedures on appeal" under 29 C.F.R. § 2560.503–1(g)(iv). That section requires a notification of an adverse benefit determination to describe "the plan's review procedures and the time limits applicable to such procedures." But the letter did advise Ms. Stewart that she had 180 days to appeal the decision. (AR at 189). So, Ms. Stewart apparently complains that the denial letter did not state that ERISA required Hartford to render a decision on

appeal within 45 days after receiving her appeal. (AR at 35). Hartford, however, did render a decision within 45 days of Ms. Stewart's appeal: Hartford rendered its decision on appeal 11 days after receipt of her appeal. (AR at 753–64; 180). Because Hartford afforded Ms. Stewart an "effective administrative review" of her claim, this court will not refuse to review Hartford's decision deferentially because of any alleged technical noncompliance with the ERISA regulations. *See Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1318 (11th Cir. 2000).

Ms. Stewart argues that Appeal Specialist Edna Golych "failed to disclose the terms of the Plan or Policy she relied on, specifically the definition of 'Disability,' set forth in the policy" in violation of 29 C.F.R. § 2560.503–1(g)(ii). Again, Ms. Golych *did* specifically set forth the policy term she relied on in denying Ms. Stewart's claim: the exclusion applicable if the claimant is receiving disability benefits for the claimed disability under a prior employer-sponsored disability plan. (AR at 180–81). Neither Hartford nor Ms. Stewart disputed the definition of "Disability" or whether Ms. Stewart was "Disabled" for the purposes of the LTD policy, so this argument fails.

Ms. Stewart argues that Hartford failed to produce documents relevant to her claim as required by 29 C.F.R. § 2560.503–1(h)(2)(iii), (4), and (m)(8). The administrative record shows otherwise. Hartford produced Ms. Stewart's entire LTD and LWOP claim files to her and to her attorneys on multiple occasions. (AR at 179; 142–43; 149).

Ms. Stewart argues that Appeal Specialist Edna Golych failed to consider the issues Ms. Stewart raised in her appeal in violation of 29 C.F.R. § 2560.503–1(h)(2)–(4). In her appeal, Ms. Stewart made a variety of contractual interpretation arguments but primarily argued that because she was still receiving benefits under the Sun Life policy, it was not a "prior plan" that had been "terminated." (AR at 763).

But Ms. Golych did address Ms. Stewart's argument: Ms. Golych made clear that Hartford interpreted the "prior disability plan" exclusion to preclude its payment of benefits when the claimant continued to receive employer-sponsored LTD benefits from a "prior carrier." (AR at 181). Again: that Ms. Stewart *disagreed* with the Hartford's decision on appeal does not mean that Hartford violated ERISA in making that decision.

Ms. Stewart claims that "Hartford failed to ensure that its claims procedures and any limitation on benefits it intended to enforce were set forth in the Summary Plan Description" as required by 29 C.F.R. § 2560.503–1(b). But the SPD requirements apply the to "plan administrator." *W.A. Griffin, MD v. Aetna Health Inc.*, 740 F. App'x 169, 170 (11th Cir. 2018) (citing 29 U.S.C. § 1024(b)(4)). And the plan documents in this case show that *Burr & Forman* acted as the "plan administrator;" accordingly, Burr—not Hartford—bore responsibility for compliance with the SPD requirements. (AR at 7; 32).

Finally, Ms. Stewart argues that Hartford "failed to adopt and maintain claims procedures processes and safeguards to insure consistent application of the Plan provisions" in violation of 29 C.F.R. § 2560.503–1(b)(5) and "failed to advise Plaintiff of any internal rule, guideline protocol, or other similar criterion it relied upon" in violation of 29 C.F.R. § 2560.503–1(g)(v)(A) and (j)(5)(i). But Ms. Stewart does not specific *how* Hartford "failed to adopt and maintain claims procedures processes and safeguards" or *how* Hartford "failed to advise" her "of any internal rule, guideline protocol, or similar criterion" it relied upon. And the court found above that Hartford's denial letters "substantially complied" with the ERISA regulations. *See Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1318 (11th Cir. 2000). Accordingly, these conclusory arguments fail.

Because all of Ms. Stewart's arguments regarding Hartford's compliance with the ERISA regulations in denying her LTD claim lack merit, the court will not apply a *de novo* standard of review to the merits of Hartford's LTD determination.

      ii.    **LWOP Claim**

Ms. Stewart also argues that Hartford denied her a full and fair administrative review of her LWOP claim. She argues (1) that the administrative record remains incomplete because it does not contain authority for Hartford to have Ms. Stewart tested; and (2) that Hartford did not have the authority to overturn the decision of appeal specialist Edna Golych awarding her benefits. Both arguments fail.

When this court granted Ms. Stewart supplemental discovery on January 9, 2019, it ordered Hartford to disclose to Ms. Stewart the authority under which it ordered her neuropsychological testing. (Doc. 56 at 8–9). This court noted that "Hartford's approval letter to Ms. Stewart mentions its authority to periodically 'verify' her *continued* disability and its intention to review her claim to 'clarify' her *current* cognitive limitations." (Doc. 56 at 8) (emphasis in original). But this court expressed concern that "the administrative record does not clearly articulate the difference, if any, between those two authorizations, nor does it adequately specify under which authorization Hartford ultimately decided to deny Ms. Stewart's [LWOP] claim." (Doc. 56 at 8).

In its discovery responses, Hartford pointed Ms. Stewart and the court to two separate policy provisions under which it ordered Ms. Stewart's testing. (Doc. 95-2 at 7–8). Hartford specifically included the first of these provisions in its letter notifying Ms. Stewart of her testing appointment with Dr. DeFilippis:

>**When Premiums are Waived**: *When will premiums be waived?*
>
>If We approve Waiver of Premium, We will notify You of the date We will begin to waive premium. In any case, We will not waive premiums for the first 9 month(s) You are Disabled. We have the right to:
>
>1) require Proof of Loss that You are Disabled; and
>2) *have You examined at reasonable intervals during the first 2 years after receiving initial Proof of Loss, but not more than once a year after that.*
>
>If You fail to submit any required Proof of Loss or refuse to be examined as required by Us, then Waiver of Premium ceases.

(AR at 242–43; 60) (emphasis added). Hartford also referenced a "Physical Examination and Autopsy" provision, which provides as follows:

>**Physical Examination and Autopsy**: *Can we have a claimant examined or request an autopsy?*
>
>While a claim is pending We have the right at Our expense:
>
>1) to have the person who has a loss examined by a Physician when and as often as We reasonably require; and
>2) to have an autopsy performed in case of death where it is not forbidden by law.

(AR at 66). The bulk of Ms. Stewart's argument regards this so-called "autopsy provision." Ms. Stewart argues, for example, that Hartford never notified Ms. Stewart of its reliance on the autopsy provision when it ordered her testing; additionally, she points out that her claim was no longer "pending" as required by the autopsy provision after Ms. Balogh awarded her benefits on December 28, 2012.

But the court concludes that the administrative record clearly shows Hartford's authority to have Ms. Stewart tested and its authority to terminate her benefits irrespective of the autopsy provision. The "When Premiums are Waived" policy provision quoted above—upon which Hartford notified Ms. Stewart of its reliance by letter dated January 24, 2013—allows Hartford to examine claimants "at reasonable intervals during the first 2 years after receiving initial Proof of

Loss." (AR at 60). And the Life Policy also put the burden on Ms. Stewart to show her continued eligibility for benefits: the Life Policy required that "[a]ll [Proof of Loss] submitted [be] satisfactory to Us." (AR at 66). Courts have interpreted such "satisfactory to Us" language to "put the onus squarely on the insured to provide 'proof' that he or she meets the eligibility requirements." *Carr v. John Hancock Life Ins. Co. (USA)*, 703 F. App'x 733, 741 (11th Cir. 2017) (citing *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008)).

And, as Hartford points out, an administrator's initial approval of benefits does not shift the burden to the administrator to show that the insured's condition changed upon its termination of benefits. *See, e.g.*, *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1361–62 (11th Cir. 2008) (administrator "had no obligation to explain" how insured's condition had changed where plan required participant to prove that she qualified for benefits); *Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp. 3d 1356, 1368 (N.D. Ga. 2019) (burden remains on plaintiff to show entitlement to ERISA benefits, even if administrator approves and then later terminates benefits).

In sum, the Life Policy put the burden squarely on Ms. Stewart to show her entitlement to LWOP benefits. The record shows that Hartford harbored questions about Ms. Stewart's cognitive limitations even after it granted her benefits, because Dr. Sharif's report—upon which Hartford relied when it granted her benefits—explicitly stated that Ms. Stewart had not had formal neuropsychological testing done. (AR at 748; 165). In light of these concerns, Hartford exercised its right to have Ms. Stewart examined under the "When Premiums are Waived" provision of the Life Policy and notified Ms. Stewart of its reliance on this provision. (AR at 242–43). Assuming without deciding that Ms. Stewart's initial LWOP application of July 2, 2012 constituted "initial Proof of Loss," the "When Premiums are Waived" provision of the Life

Policy allowed Hartford to have Ms. Stewart examined "at reasonable intervals during the first 2 years" after it received that Proof of Loss. (AR at 1613–15).

Dr. DeFilippis's examination of Ms. Stewart took place on March 8, 2013, well within the two-year examination window allowed by the "When Premiums are Waived" provision of the Life Policy. (AR at 1037). Hartford properly took these actions without regard to the autopsy provision, so Ms. Stewart's arguments regarding that provision fail. Hartford's discovery responses do not state that it relied *only* on the autopsy provision in having her examined, nor does Hartford argue as such in its briefing. (*See* doc. 95-2 at 7–8). Instead, the Administrative Record shows that Hartford relied on the "When Premiums are Waived" section of the Life Policy to have Ms. Stewart examined. (AR at 240–43).

The court acknowledges that Hartford quickly terminated Ms. Stewart's benefits after granting them only a few months prior, and that Ms. Stewart's condition likely had not changed in the interim. But Hartford properly had Ms. Stewart examined under the terms of the Life Policy and determined that she had not met her burden of proving her entitlement to benefits. It had the authority under the policy to do so.

So, the court concludes that the administrative record in this case shows that the Life Policy provided Hartford with the procedural authority to both (1) have Ms. Stewart examined; and (2) to terminate her benefits without explaining how her condition had changed. Ms. Stewart has had "a reasonable opportunity to contest whether [the administrative] record is complete" and the court concludes that that record is now complete. *See Williamson v. Travelport, LP*, 953 F.3d 1278, 1289 (11th Cir. 2020). So, the court will proceed to the merits of the motions for judgment and will now engage in the review set out in *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

40

### B.       Benefits Determination: LTD Claim

As explained above, Hartford denied Ms. Stewart's claim for LTD benefits based on the

following exclusion in the Disability Policy:

> If You are receiving or are eligible for benefits for a Disability under a prior
> disability plan that:
>
> 1) was sponsored by Your Employer; and
> 2) was terminated before the Effective Date of The Policy;
>
> No benefits will be payable for the Disability under The Policy.

(AR at 16). Ms. Stewart claims that Hartford erroneously denied her claim for LTD benefits

under this exclusion. The court disagrees and finds that Hartford's decision to deny Ms.

Stewart's claim under the exclusion was *de novo* correct, or at the very least not arbitrary and

capricious. Because Ms. Stewart does not argue that a conflict of interest tainted Hartford's

decision to deny her LTD claim, the court will not pass the third step of the *Blankenship*

framework.

### i.       *Blankenship* Step One: *De Novo* Review

Under the first step of the *Blankenship* framework, the court applies "the *de novo*

standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e.,

the court disagrees with the administrator's decision); if it is not, then [the court] end[s] the

inquiry and affirm[s] the decision." *Blankenship*, 644 F.3d at 1355.

The parties advance contractual interpretation arguments regarding the exclusion, which

the court will refer to as the "Prior Plan Exclusion." The burden generally falls on the insurer to

prove that a "specific policy exclusion applies to deny the insured benefits." *Horton v. Reliance

Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Tr. Life

Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). Aside from this rule, the Eleventh Circuit has

pointed out that "ERISA is silent on matters of contract interpretation." *Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1183 (11th Cir. 2004).

When faced with silence from ERISA on a matter of its interpretation, "[c]ourts have the authority to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." *Horton*, 141 F.3d at 1041 (quoting *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir. 1990)). Federal courts interpreting ERISA contracts "may look to state law as a model because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes." *Horton*, 141 F.3d at 1041. *See also Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 607 (11th Cir. 2017) (looking to Florida law to interpret pre-existing condition exclusion in ERISA-governed disability policy).

Finally, "[t]o decide whether a particular rule should become part of ERISA's common law, courts must examine whether the rule, if adopted, would further ERISA's scheme and goals." *Horton*, 141 F.3d at 1041 (quoting *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986)). And "ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans, and (2) uniformity in the administration of employee benefit plans." *Horton*, 141 F.3d at 1041 (citing *Smith v. Jefferson Pilot Life Ins. Co.*, 14 F.3d 562, 570–71 (11th Cir. 1994)).

Under Alabama law, "[w]hen analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them." *St. Paul Fire & Marine Ins. Co. v. Britt*, 203 So. 3d 804, 811 (Ala. 2016) (quoting *Travelers Cas. & Sur. Co. v. Ala. Gas Corp.*, 117 So. 3d 695, 700 (Ala. 2012)). After applying this standard, if the policy provision is "reasonably certain in [its] meaning, [it is] not ambiguous as a matter of law" and the court should not apply rules of

construction. *Britt*, 203 So. 3d at 811. And a provision "is not made ambiguous by the fact that the parties interpret the policy differently or disagree as to the meaning of a written provision in a contract." *Britt*, 203 So. 3d at 811. Additionally, "[a] court must not rewrite a policy so as to include or exclude coverage that was not intended." *Britt*, 203 So. 3d at 811.

And another Alabama rule of contract interpretation bears relevance to this case: under Alabama law, courts should not "presume that the parties 'make use of the words in their contracts to which no meaning is attached by them.'" *Black Diamond Dev., Inc. v. Thompson*, 979 So. 2d 47, 51 (Ala. 2007) (quoting *McGoldrick v. Lou Ana Foods, Inc.*, 649 So. 2d 455, 458 (La. Ct. App. 1994)). Courts presume "that every condition was intended to accomplish some purpose" and should not presume "that idle provisions were inserted." *Thompson*, 9 So. 2d at 51 (quoting *Royal Ins. Co. of Am. v. Thomas*, 879 So. 2d 1144, 1154 (Ala. 2003)).

And finally, if a court finds a policy term ambiguous and "if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem*, any ambiguity must be construed against the drafter of the contract." *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000) (citing *Lackey v. Cent. Bank of the S.*, 710 So. 2d 419, 422 (Ala. 1998)).

Hartford interprets the Prior Plan Exclusion to preclude its payment of benefits to a claimant who is receiving benefits for the claimed disability from any prior employer-sponsored disability *insurance policy* or from any *prior carrier* that provided coverage under an employer-sponsored disability insurance policy. Ms. Stewart, on the other hand, primarily argues that Burr has had one *continuous disability plan* and that only the insurance company funding and insuring the plan changed. Because she obtained her Sun Life benefits under the Burr disability plan and because Hartford insures that same plan, Ms. Stewart maintains that she did not receive the Sun

Life benefits under a "prior disability plan" for the purposes of the Prior Plan Exclusion. The court concludes that the Prior Plan Exclusion is not ambiguous, because Ms. Stewart's interpretation is unreasonable as a matter of law, so Hartford's decision to deny her LTD benefits on the basis of that exclusion was *de novo* correct.

At the outset, the court will note that the Prior Plan Exclusion certainly does not constitute a paragon of artful drafting. As Ms. Stewart points out, the Disability Policy contains many defined terms, but the Disability Policy's Definitions section does not contain a definition for "prior disability plan." Hartford could and should have provided a definition for that term. But the Prior Plan Exclusion, taken as a whole and read from the standpoint of a reasonable insured, supports Hartford's interpretation. (*See* AR at 20–22); *see St. Paul Fire & Marine Ins. Co. v. Britt*, 203 So. 3d 804, 811 (Ala. 2016).

The Prior Plan Exclusion relieves Hartford from paying benefits for the claimed "Disability" if the claimant "is receiving" benefits for the same "Disability" under a "prior disability plan" that was sponsored by the claimant's employer and that was terminated before the effective date of "The Policy." Ms. Stewart falls into the exact category of claimants contemplated by the exclusion: when she applied for LTD benefits because of her Parkinson's disease under Hartford's Disability Policy, she was already receiving disability benefits because of her Parkinson's disease from Sun Life's disability policy, which Burr sponsored. (AR at 127). Burr terminated the Sun Life disability policy the day before the effective date of Hartford's Disability Policy. (AR at 7; 123). As Hartford points out, if it were to pay her LTD benefits for her Parkinson's disease, she would receive more in monthly disability benefits between the Hartford and Sun Life policies than she would have received in monthly compensation for working full-time. (Doc. 95–1 at 27). A reasonable insured would read the Prior Plan Exclusion

to prevent such a windfall; additionally, the court will not "rewrite [the Disability Policy] so as to include…coverage that was not intended." *Britt*, 203 So. 3d at 811.

Ms. Stewart's suggested interpretations fail. As the court explained above, Ms. Stewart argues that Burr has had *one continuous* disability "plan" and that only the *insurance company* funding the plan changed; accordingly, the LTD benefits she was receiving from the Sun Life policy did not constitute benefits from a "prior disability plan." (Doc. 97 at 5, ¶ 6; 28). Ms. Stewart also argues that the LTD benefits Sun Life paid her for her Parkinson's disease were not "benefits for a Disability" under the Prior Plan Exclusion because the Hartford plan has its own definition of "Disability" separate and apart from the definition of "disability" in the Sun Life plan. But both of these interpretations would render the Prior Plan Exclusion meaningless. As to Ms. Stewart's argument that her benefits from Sun Life were not from a "prior disability plan" because Burr has had one continuous disability plan, the court cannot contemplate a situation where the Prior Plan Exclusion would *ever* apply under such an interpretation, apart from a situation where an employer terminated and replaced *its entire employee welfare benefits plan*. Ms. Stewart, for her part, has not argued that Burr uprooted its entire employee welfare benefits plan, nor has she provided an example of *any* situation where the exclusion would apply. But such an interpretation would render the Prior Plan Exclusion meaningless, and courts must presume "that every condition [in an insurance contract] was intended to accomplish some purpose" and should not presume "that idle provisions were inserted."  *Black Diamond Dev., Inc. v. Thompson*, 979 So. 2d 47, 51 (Ala. 2007) (quoting *Royal Ins. Co. of Am. v. Thomas*, 879 So. 2d 1144, 1154 (Ala. 2003)).

Ms. Stewart's argument regarding Hartford's definition of "Disability" fails for the same reason. Every disability insurance policy has its own definition of "disability;" accordingly, the

Prior Plan Exclusion would never apply were it limited to disability benefits paid made pursuant to Hartford's own definition of "Disability" because *no* "prior plan" would pay disability benefits pursuant to *Hartford's* definition of "Disability."

Ms. Stewart also argues that the Prior Plan Exclusion cannot apply to "prior policies" because Hartford defined the term "Prior Policy" in the Definitions section of the Disability Plan. But Hartford defined "Prior Policy" to mean "the long term disability insurance carried by the Employer *on the day before the Policy Effective Date*." (AR at 22) (emphasis added). If Hartford had limited the Prior Plan Exclusion to apply only to its definition of "Prior Policy," the Prior Plan Exclusion would *not* apply to any benefits a claimant was receiving under an employer-sponsored disability policy in place *before* the policy in effect on the day before Hartford's policy went in to effect. Instead, Hartford crafted the exclusion to apply if the claimant was receiving *any employer-sponsored disability benefits* at the time they sought benefits under Hartford's Disability Policy.

Ms. Stewart argues that Burr did not "terminate" the Sun Life disability policy as required by the Prior Plan Exclusion because she continued to receive benefits under that policy. But, as Hartford points out, that Burr "terminated" the Sun Life policy for the purposes of *new claimants* does not mean that Sun Life did not have an obligation to continue its payment of benefits to its current recipients of LTD benefits, including Ms. Stewart. The administrative record in this case unequivocally shows that Burr terminated the Sun Life disability policy on September 30, 2010. (AR at 123).

Ms. Stewart next argues that Hartford's interpretation of the Prior Plan Exclusion would render certain of the Disability Policy's eligibility requirements meaningless. The Disability Policy requires claimants to be "Full-Time Active Employees," which the Disability Policy

defines as working "at least 30 hours weekly." (AR at 9). The Disability Policy also provides a deferred effective date for employees who were absent on the effective date of the Policy: for those employees, the Disability Policy went in to effect on the first day that employee was "Actively at Work"—working his or her usual number of hours for the employer—for one full day. (AR at 11). According to Ms. Stewart, the Prior Plan Exclusion renders these provisions a nullity: she was a "Full-Time Active Employee" within the Disability Policy's meaning, yet Hartford still denied her benefits. This argument fails, however, because these policies still have effect so long as the claimant is *not receiving benefits under a prior employer-sponsored disability plan*. The Prior Plan *Exclusion* does not strip meaning from the Disability Policy's general *eligibility* requirements.

Finally, Ms. Stewart argues that Hartford "invent[ed] its own denial language" when it denied Ms. Stewart's claim under the Prior Plan Exclusion. (Doc. 97 at 33). Ms. Stewart points out that Hartford denied her claim because she was receiving benefits from a "prior carrier" as opposed to benefits under a "prior disability plan" as required by the exclusion. (AR at 181). The court, however, views the "prior carrier" language as Hartford's *interpretation* of the "prior disability plan." Instead of "inventing its own denial language," as Ms. Stewart asserts, Hartford merely explained to Ms. Stewart that because she was receiving benefits from a prior carrier under a plan sponsored by Burr, she was receiving benefits under a "prior disability plan" for the purposes of the Prior Plan Exclusion. And the Disability Policy granted Hartford the discretion to interpret the terms of its own policy. (AR at 19).

The court also concludes that adopting Hartford's construction of the Prior Plan Exclusion as a common-law rule better squares with ERISA's goals. Congress enacted ERISA in part with the goal of "protection of the interests of employees and their beneficiaries in employee

benefit plans." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998).

As explained above, were Hartford to pay Ms. Stewart benefits in addition to the benefits Sun

Life continues to pay her, Ms. Stewart would receive more in monthly disability benefits than

she earned from working full time. But administrators of ERISA-governed plans owe a duty to

*all beneficiaries* to "preserve limited plan assets" and to "prevent…*windfalls for particular*

*employees*." *Conkright v. Frommert*, 559 U.S. 506, 520 (2010) (deferring to plan administrator's

interpretation of plan where alternative interpretation would put pension beneficiaries in better

position than employees who never left the company) (citing *Varity Corp. v. Howe*, 516 U.S.

489, 514 (1996)) (emphasis added). Additionally, Hartford's interpretation better advances

ERISA's goal of promoting "uniformity in the administration of employee benefit plans."

*Horton*, 141 F.3d at 1041. As the court pointed out above, Ms. Stewart has not provided a

reasonable situation where the Prior Plan Exclusion would apply under her interpretation. But

this court will not render meaningless a reasonable and unambiguous exclusion.

In sum, the court finds that the Prior Plan Exclusion—as read by a reasonable insured—

unambiguously excludes Ms. Stewart from LTD coverage under Hartford's Disability Policy.

*See St. Paul Fire & Marine Ins. Co. v. Britt*, 203 So. 3d 804, 811 (Ala. 2016). Because the Prior

Plan Exclusion is unambiguous, the court will not apply the doctrine of *contra proferentem. See*

*Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000). Accordingly, the court

finds Hartford's decision to deny Ms. Stewart LTD benefits under the Prior Plan Exclusion *de*

*novo* correct.

### ii.    *Blankenship* Step Three: Arbitrary and Capricious Review

The parties agree that the Disability Policy granted Hartford deference to interpret its

terms under *Blankenship*'s second step. (AR at 19). Accordingly, even were Hartford's decision

to deny Ms. Stewart LTD benefits *de novo* wrong, the court must review Hartford's decision under the deferential "arbitrary and capricious" standard. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). In the Eleventh Circuit, courts use the "arbitrary and capricious" and "abuse of discretion" standards interchangeably. *Blankenship*, 644 F.3d at 1355 n.5 (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (1989)). And "a decision to deny benefits is arbitrary and capricious if no reasonable basis exists for the decision." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325–26 (11th Cir. 2001) (quoting *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997)).

In the context of the interpretation of ERISA-governed insurance contracts, the administrator abuses its discretion if it makes its determination based on "an erroneous view of the law." *Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 606 (11th Cir. 2017). In *Bradshaw*, for example, a plan administrator acted arbitrarily and capriciously when it applied the wrong standard—as established by relevant caselaw—to a disability policy's pre-existing condition exclusion. *Bradshaw*, 707 F. App'x at 608–09.

In this case, even if Hartford made a *de novo* "wrong" decision to apply the Prior Plan Exclusion to Ms. Stewart's claim for LTD benefits, it certainly did not act arbitrarily and capriciously in doing so. Unlike the claimant in *Bradshaw*, Ms. Stewart has *not* presented caselaw that foreclosed Hartford's interpretation of the Prior Plan Exclusion. Instead, even if the court *did* find the Prior Plan Exclusion provision ambiguous, it still would not construe that provision against Hartford in the context of arbitrary and capricious review. As the Eleventh Circuit has pointed out, "the 'reasonable interpretation' factor and the arbitrary and capricious standard of review would have little meaning if ambiguous language in an ERISA plan were construed against the plan administrator." *White v. Coca-Cola Co.*, 542 F.3d 848, 857 (11th Cir.

2008) (quoting *Cagle v. Bruner*, 112 F.3d 1510, 1519 (11th Cir. 1997)) (internal alterations omitted). And as explained above, Ms. Stewart's claim satisfied all of the Prior Plan Exclusion's requirements: on the date she applied for LTD benefits under Hartford's Disability Policy, she continued to receive benefits for the same disability under a prior employer-sponsored disability plan. Because Hartford had a "reasonable basis" for applying the Prior Plan Exclusion to Ms. Stewart's claim, Hartford did not abuse its discretion in denying Ms. Stewart's LTD claim. *See Levinson*, 245 F.3d at 1325–26.

Because Hartford's benefits determination as to Ms. Stewart's LTD claim was *de novo* correct—or at least not an abuse of discretion—the court will **DENY** Ms. Stewart's motion for judgment as to her LTD claim and will **GRANT** Hartford's motion as to her LTD claim.

### C.        *Benefits Determination: LWOP Claim*

Hartford ultimately denied Ms. Stewart's claim for life-waiver-of-premium benefits because it determined that she did not meet the Life Policy's definition of "Disabled:"

> **Disabled:** *What does Disabled mean?*
>
> Disabled means You are prevented by injury or sickness from doing any work for which You are qualified by:
>
>   1) Education;
>   2) Training; or
>   3) Experience.
>
> ***

(AR at 60). The parties agree that the Life Policy vested Hartford with discretion to interpret the terms of the policy and to make benefits-eligibility determinations. (AR at 67). Ms. Stewart additionally claims that Hartford's conflict of interest tainted its decision to deny her LWOP benefits. Accordingly, the court will conduct the full *Blankenship* analysis on Hartford's LWOP decision but will ultimately review its decision for abuse of discretion, taking the conflict into

consideration as one factor in determining whether Hartford acted arbitrarily and capriciously in denying Ms. Stewart's LWOP claim.

The court concludes that, while a close call, Hartford's decision to deny Ms. Stewart LWOP benefits was *de novo* correct. Alternatively, the court concludes that Hartford's LWOP determination was not arbitrary and capricious and that Ms. Stewart has not shown that Hartford's conflict played a role in its decision.

### i.   *Blankenship* **Step One:** *De Novo* **Review**

As explained above, Hartford denied Ms. Stewart's initial claim for LWOP benefits on October 1, 2012. (AR at 252). Hartford then granted Ms. Stewart LWOP benefits on December 28, 2012 after her first appeal. (AR at 244). After Ms. Stewart sat for testing with Dr. DeFilippis, Hartford terminated her LWOP benefits on April 10, 2013. (AR at 235). Finally, Hartford, through a letter written by Appeal Specialist Marsha Macko, upheld its decision to terminate Ms. Stewart's LWOP benefits on November 21, 2013. (AR at 223). Because courts reviewing ERISA benefits determinations review only the administrator's final decision, the court will limit its review to Hartford's final decision as communicated to Ms. Stewart by Ms. Macko. (AR at 223–29). *See Till v. Lincoln Nat'l Life Ins. Co.*, 678 F. App'x 805, 808 n.2 (11th Cir. 2017) ("This Court, in line with several other Circuit Courts of Appeal, will consider only the reasonableness of an administrator's final decision") (citing *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008)).

And to reiterate, at the *de novo* step of the *Blankenship* analysis, the court must "determine whether the claim administrator's benefits-denial decision is 'wrong;' i.e., [whether] the court disagrees with the administrator's decision." *Blankenship*, 644 F.3d at 1355

(parenthesis omitted). Although it is a close call, the court agrees with Hartford's decision to deny Ms. Stewart LWOP benefits and consequently finds Hartford's decision *de novo* correct.

The court will begin its *de novo* review of Hartford's LWOP decision by emphasizing the Life Policy's definition of "Disabled." Ms. Stewart claims that she met the Life Policy's definition of "Disabled" because the medical evidence clearly showed that she could not perform the duties of an attorney, her occupation at the time she filed for LWOP benefits. (Doc. 97 at 36). And Hartford does not dispute that Ms. Stewart could no longer perform the duties of an attorney. (AR at 229). But, as Hartford points out, "the definition of 'Disabled' contained in the [Life Policy] is specific to *any occupation* and is not limited to the duties of an attorney." (AR at 229) (emphasis added). To meet the Life Policy's definition of "Disabled," the claimant must be "prevented by injury or sickness from doing *any work* for which [the claimant] is qualified by (1) education; (2) training; or (3) experience." (AR at 60) (emphasis added).

Hartford additionally interpreted the "any work" term to include "work that can be performed on a full time *or part time* basis, for remuneration *or on a volunteer basis*." (AR at 226). And this "any work" definition of "Disabled" stands in sharp contrast to the *Disability Policy*'s definition of "Disabled," under which the claimant is "Disabled" if she cannot perform "one or more of the Essential Duties of *Your Occupation*…" (AR at 20) (emphasis added). By its plain terms, then, a claimant does not necessarily meet the definition of "Disabled" in the Life Policy if she cannot perform her own occupation but can perform any work, and the court will not read such a requirement into the Life Policy.

When the court views the medical evidence through the lens of the proper standard, it concludes that Ms. Stewart did not meet the Life Policy's definition of "Disabled." Importantly, her attending physician Dr. David Standaert *never* opined that Ms. Stewart could not perform

*any work.* Her visits with Dr. Standaert between 2010 and 2012 show a general trend of the worsening of Ms. Stewart's Parkinson's symptoms, both physical and cognitive: she had increased tremors and fatigue and decreased concentration. By 2012, Dr. Standaert reported that she could sit, stand and drive only occasionally and never finger or handle. Dr. Standaert also concluded in 2012 that "the severity of her symptoms at this point make it impossible for her to continue *in her occupation as an attorney*, and I concur with the decision to seek disability and retirement at this point." (AR at 790) (emphasis added).

But Dr. Standaert also opined that Ms. Stewart could participate in vocational rehabilitation services. (AR at 813). And when he communicated with Dr. Gordon about Ms. Stewart's Parkinson's disease, he concluded that he did not think her capable of "continuing her *former occupation*" and that "she unquestionably qualifies as having disability under the more ordinary terms of the *ADA*." (AR at 1024) (emphasis added). But neither of these statements support a conclusion that Ms. Stewart could not perform "any work;" the ADA does not define "Disabled" as the inability to perform "any work." *See* 42 U.S.C. § 12102(1)(A) ("The term 'disability' means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual…").

Additionally, all of Hartford's external reviewers concluded that Ms. Stewart had both the physical and cognitive capability to perform some work. Dr. Uzma Sharif, who spoke with Dr. Standaert and relied only upon his records in formulating her opinion, concluded that Ms. Stewart had the physical capability to work somewhere where "she did not have the stress of deadlines; where she could perform open-ended tasks at her own comfort level and where she did not have to perform fine motor manipulation." (AR at 225). Dr. DeFilippis concluded that she had only mild cognitive impairment related to her speed in completing tasks and to her

attention span; he noted that she "likely has a belief that she is less capable from a cognitive standpoint than she actually is." (AR at 1050). Dr. Contardo likewise concluded that Ms. Stewart retained the cognitive capacity to perform "full time work that does not require higher-level, complex organization and cognitive skills." (AR at 924). Finally, Dr. Gordon, who, like Dr. Sharif, communicated about Ms. Stewart with Dr. Standaert, concluded that Ms. Stewart retained the physical capability to perform "full time sedentary work" within certain limits. (AR at 930).

Additionally, Ms. Stewart's self-reported limitations also tend to show that she did not meet the Life Policy's definition of "Disabled." On her application for LWOP benefits, Ms. Stewart reported primarily that she had issues with performing her own job as an attorney. (AR at 1614). Ms. Stewart reported similar concerns to Dr. DeFilippis. (AR at 1041). And Ms. Stewart reported to Dr. DeFilippis that she could travel, serve in several light volunteer roles, prepare meals, handle financial matters, shop, spend time with friends, and drive with medication. (AR at 1040–41). A person with these capabilities could very likely perform *some* work, even if that person had to work part time.

However, several of Dr. Standaert's statements to Dr. Gordon support a finding that Ms. Stewart satisfied the Life Policy's definition of "Disabled." Dr. Standaert informed Dr. Gordon that Ms. Stewart's Parkinson's caused her to have "impaired balance with the risk of falling, impaired use of hands with inability to write, and rigidity, all of which make self-care difficult or impossible much of the time." (AR at 1024). Dr. Standaert additionally noted to Dr. Gordon that fatigue presented as an "early and dominant" symptom of Ms. Stewart's Parkinson's disease and prevented her from working full days as an attorney. (AR at 1024). Such fatigue would likely prevent Ms. Stewart from working full days in *any occupation*, but Hartford did not limit its definition of "any work" to just full-time work.

54

And, as explained above, the Social Security Administration found that Ms. Stewart became "disabled" for its purposes on April 1, 2012. (AR at 560). But Hartford did not necessarily make a *de novo* "wrong" determination that Ms. Stewart did not meet *its* Life Policy's definition of "Disabled" merely because it rendered a decision at odds with that of the Social Security Administration. As Hartford pointed out in Ms. Macko's November 21, 2013 letter, the Life Policy contained a more stringent definition of "Disabled" than that used by the SSA. (AR at 229). Other courts have concluded that a private insurer properly denied a claimant disability benefits even when the SSA granted the same claimant benefits. *See, e.g.*, *Blair v. Metro. Life Ins. Co.*, 955 F. Supp. 2d 1229, 1248 (N.D. Ala. 2013) (where, like here, the administrative record contained only Notice of Award from SSA, this court found that SSA award standing alone had "limited probative value" as to claimant's eligibility for LTD benefits under looser "Own Occupation" definition of "Disabled") (citing *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1280 n.2, 1281, 1286 (11th Cir. 2003)). And Ms. Stewart does not contend that Hartford improperly failed to consider the SSA award.

But, taken as a whole, Ms. Stewart's own reports of her symptoms and the opinions of both Dr. Standaert and the reviewing doctors lead to the court to conclude that Ms. Stewart had the capability to perform some work, even if that work was part time or volunteer. Accordingly, she did not meet the Life Policy's definition of "Disabled" and Hartford's decision to deny her LWOP benefits was *de novo* correct, although the record likely supports an alternative conclusion.

### ii.      *Blankenship* Step Three: Arbitrary and Capricious Review

Even if Hartford's decision to deny Ms. Stewart LWOP benefits was *de novo* wrong, it did not act arbitrarily and capriciously in doing so. An administrator makes an arbitrary and

capricious benefits determination if "*no* reasonable basis exists for the decision." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325–26 (11th Cir. 2001) (emphasis added). In other words, "the record [must] reasonably support[] the administrator's decision." *Kaviani v. Reliance Standard Life Ins. Co.*, 799 F. App'x 753, 757 (11th Cir. 2020) (citing *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002)). In the specific context of disability determinations, an administrator acts arbitrarily and capriciously if it "cherry-pick[s] favorable evidence to rely upon [but ignores an] abundance of unfavorable medical evidence." *Kaviani*, 799 F. App'x at 759.

Ms. Stewart also contends that Hartford's conflict of interest caused it to arbitrarily and capriciously in denying her claim for LWOP benefits. The parties agree that Hartford had a conflict of interest because it both makes benefits determinations and pays benefits under the Burr plan. *See Blankenship*, 644 F.3d at 1355 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)). But because such a conflict represents "an unremarkable fact in today's marketplace," the burden falls on Ms. Stewart to show that the conflict influenced Hartford's decision; in other words, Hartford need not "prove its decision was not tainted by self-interest." *Blankenship*, 644 F.3d at 1356, 1355 (citing *Glenn*, 554 U.S. at 120, and quoting *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1360 (2008)). When determining whether Hartford's conflict of interest caused it to act arbitrarily and capriciously, the court must examine the conflict's "inherent or case-specific importance" to Ms. Stewart's case. *Blankenship*, 644 F.3d at 1355 (quoting *Glenn*, 554 U.S. at 117). And under the *Blankenship* framework, Hartford's conflict remains "merely…a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Blankenship*, 644 F.3d at 1355 (citing *Glenn*, 554 U.S. at 116).

The court concludes that Hartford had a reasonable basis for its decision to deny Ms. Stewart LWOP benefits and accordingly did not act arbitrarily and capriciously in making that decision. As explained above, all of Hartford's external reviewers concluded that Ms. Stewart had the physical and cognitive abilities to perform some work. Dr. Sharif concluded that Ms. Stewart had the physical capacity to work somewhere "without the stress of deadlines" (AR at 748); Dr. DeFilippis concluded that she likely believed that her cognitive impairments were worse than they actually were (AR at 1050); Dr. Contardo concluded that she retained the cognitive capacity to perform "full time work that does not require higher-level, complex organization and cognitive skills" (AR at 924); and Dr. Gordon opined that she retained the physical capacity to work within limits and with breaks. (AR at 930).

Ms. Stewart argues that Hartford unreasonably interpreted Dr. Standaert's opinion of Ms. Stewart's abilities in reaching its conclusion that she could perform some work. Although Dr. Standaert's observations that Ms. Stewart suffered from fatigue and experienced difficulty in self-care support a conclusion that Ms. Stewart did not have the capability to perform any work, nothing required Hartford to give his opinion controlling weight. Instead, "[w]hile plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1287 (11th Cir. 2003) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)) (internal alterations omitted).

And in this case, although Hartford did not give Dr. Standaert's opinion controlling weight, it did not arbitrarily refuse to give it *any* credit. Hartford conceded, for instance, that Ms. Stewart did not have the ability to perform the material duties of an attorney, a conclusion that it drew from Dr. Standaert's opinion. (AR at 229). Hartford instead decided to give more weight to opinions of its own independent medical reviewers and to Ms. Stewart's own self-reported functionality, an allowable course of action. *See Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1359 (M.D. Fla. 2004) ("It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper review of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled") (citing *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994)). Indeed, Hartford gave the *most* weight to Ms. Stewart's own self-reported functionality, which supported a finding that she retained the physical and cognitive capability to perform at least part-time work. (AR at 227).

In her "Motion to Strike and/or Evidentiary Objections," Ms. Stewart argues that Hartford acted arbitrarily and capriciously by not supplying Drs. Contardo and Gordon with all of Ms. Stewart's medical records. The administrative record shows that Ms. Macko provided Drs. Contardo with "all medical records received as of the date of [the] referral…including [Ms. Stewart's] most recent self-reported statements of functionality." (AR at 1031). But Ms. Macko did not provide Drs. Contardo and Gordon with Dr. DeFilippis's BFE because Ms. Stewart complained on appeal that Dr. DeFilippis erroneously filled out the BFE; the BFE directed Ms. Stewart's attending physician to complete it, not Dr. DeFilippis. Ms. Stewart cannot complain that the BFE contained flaws while also complaining that Hartford failed to take it into account. (AR at 154). Additionally, Ms. Macko did not provide Dr. Sharif's report to Drs. Contardo and Gordon because Dr. Sharif had not examined Ms. Stewart (AR at 154) and because Hartford did

not want Dr. Sharif's opinion to bias Drs. Gordon and Contardo, who acted as subsequent

independent reviewers. (AR at 1031). Ms. Stewart has not shown that Hartford failed to provide

any other records to Drs. Gordon and Contardo, and any argument that it did fail to provide

medical records amounts to nothing but speculation. And Hartford did not act arbitrarily and

capriciously in withholding the documents it did withhold from Drs. Gordon and Contardo; it has

provided reasonable explanations for that decision.

But Ms. Stewart primarily argues that Hartford's conflict of interest caused it to

arbitrarily and capriciously deny her LWOP benefits. First, Ms. Stewart believes that Ian Hardy

improperly terminated her LWOP benefits after Ms. Golych approved her claim and after Dr.

DeFilippis tested Ms. Stewart.  (AR 235–39). In several of Mr. Hardy's performance reviews

that Ms. Stewart obtained in discovery, Mr. Hardy noted his role in a so-called "PW stretch

project." (Doc. 67-4 at 26). According to Ms. Stewart, Hartford initiated this "stretch project" to

deny LWOP claims regardless of their merit. Ms. Stewart cites Mr. Hardy's LinkedIn profile in

support of her conclusion, but because the administrative record does not contain Mr. Hardy's

LinkedIn profile and because Ms. Stewart has not shown that the claims administrator otherwise

had knowledge of Mr. Hardy's comments on LinkedIn, the court will not repeat or rely on those

comments here. *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir.

2008) (courts in ERISA cases may only consider "the facts known to the administrator at the

time the decision was made") (quoting *Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137,

1139 (11th Cir. 1989)).

Ms. Stewart points to several comments Mr. Hardy made in his performance reviews to

support her conclusion that Hartford initiated the "stretch project" to deny LWOP claims

regardless of their merit. (Doc. 67-4). The court has reviewed each of Mr. Hardy's comments

cited by Ms. Stewart and the context in which he made them. The court concludes that these statements do not satisfy Ms. Stewart's burden of showing that Hartford's conflict caused it to arbitrarily and capriciously deny her LWOP claim. First, Mr. Hardy's statements in no way prove that he wrongfully terminated Ms. Stewart's LWOP benefits. As Hartford noted in its interrogatory responses, Hartford employees used the term "stretch project" to refer to work distinct from the ordinary responsibilities of that employee. (Doc. 95-3 at 4). And Hartford has already explained Ian Hardy's involvement with Ms. Stewart's claim: Mr. Hardy took part in Hartford's effort to centralize its LWOP claims by reassigning those claims to a dedicated team located in one office. (Doc. 95-3 at 4).

But most importantly, the court notes that even assuming without deciding that Mr. Hardy did in fact improperly terminate Ms. Stewart's LWOP claim, which she has not shown, Mr. Hardy *played no role in Hartford's final benefits decision*. Ms. Macko issued Hartford's final decision to terminate Ms. Stewart's LWOP benefits. And courts reviewing ERISA benefits determinations review only the administrator's final decision. *Till v. Lincoln Nat'l Life Ins. Co.*, 678 F. App'x 805, 808 n.2 (11th Cir. 2017) ("[t]his Court, in line with several other Circuit Courts of Appeal, will consider only the reasonableness of an administrator's final decision") (citing *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008)). Accordingly, the court concludes that Mr. Hardy's participation in an LWOP "stretch project" does not prove—or even suggest—that Hartford's conflict of interest played any role in its decision to deny Ms. Stewart LWOP benefits.

Finally, Ms. Stewart argues that Anna Davis—the Hartford employee who directed Ms. Stewart's neuropsychological testing in the notes of Ms. Stewart's LWOP claim (AR at 165)— actually worked for Hartford's "business unit" and directed Ms. Stewart's testing to improperly

terminate her benefits. Ms. Stewart again reaches this conclusion based on a LinkedIn profile belonging to an "Anna Davis" who worked for Hartford's business unit. But Ms. Stewart has pointed to no evidence in the administrative record supporting her conclusion or showing that the Anna Davis who worked on Ms. Stewart's claim is the Anna Davis on LinkedIn who worked for Hartford's business unit. In the absence of such evidence, the court will not consider such a speculative argument. And although Hartford has not explained Ms. Davis's *appearance*, it does not bear the burden of showing that its *conflict of interest* led to her involvement. *See Blankenship*, 644 F.3d at 1355.

For the above reasons, the court concludes that a reasonable basis existed in the record for Hartford's decision to deny Ms. Stewart LWOP benefits and finds that Ms. Stewart has not borne her burden of proving that Hartford's conflict of interest played any role in its decision. Accordingly, even if Hartford made a *de novo* wrong decision to deny Ms. Stewart LWOP benefits, it did not act arbitrarily and capriciously in making that decision.

## V.     Conclusion

Hartford acted within its discretion in applying the Prior Plan Exclusion to Ms. Stewart's LTD claim and supported its decision that she did not qualify as "Disabled" under the Life Policy with evidence in the record. And Hartford acted within its procedural authority in making those determinations.

Accordingly, the court will **DENY** Ms. Stewart's motion for judgment (doc. 96), will **GRANT** Hartford's motion (doc. 95), and will **ENTER JUDGMENT** for Hartford and against Ms. Stewart. And because Ms. Stewart improperly brought her "Motion to Strike and/or Evidentiary Objections" (doc. 103), the court will **DENY** that motion.

**DONE** and **ORDERED** this 6th day of May, 2021.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE